CITY OF WAHPETON, North Dakota,
Plaintiff, Respondent and Cross-
Appellant,

v.

DRAKE–HENNE, INC., a corporation,
et al., Defendants, Appellants and
Cross-Respondents.

Civ. No. 8870.

Supreme Court of North Dakota.

Aug. 10, 1973.

On Rehearing Feb. 1, 1974.

Rehearings Denied March 27, 1974.

John D. Kelly, of Wattam, Vogel, Vogel & Peterson, Fargo, for defendants, appellants and cross-respondents.

James L. Lamb, Grand Forks, for American Cas. Co.

Bruce E. Bohlman, Grand Forks, for Johnson, Milloy & Eckert, Wahpeton, for plaintiff, respondent and cross-appellant.

OPINION OF AUGUST 10, 1973.

TEIGEN, Justice (on rehearing).

Following the issuance of an opinion with one dissent, we granted a rehearing in this case. After the reargument a majority of this court have agreed that the opinion previously issued should be modified in two important respects.

We do not agree that the City is limited to recover damages by the number of feet of deficiencies in curb and gutter and eight other listed items discovered within one year of the completion of the project.

In other respects, we agree with the opinion as originally issued. Judge Erickstad, who authored the first opinion, has decided to file his opinion as his dissent. We therefore adopt his dissent as to the facts and affirm the issues decided therein, with the following exceptions:

■ 1. We do not agree that the trial court erred in awarding the cost of repairing "deficiencies" discovered after the expiration of the one-year warranty period. We believe and conclude that all injuries sustained by the City in this case are attributable to one defect in workmanship: the failure to compact backfilled trenches to 95% of Proctor. The City gave timely notice of this defect to Drake-Henne. Thus the City passed to the contractor [Drake-Henne] the duty to discover how much of its work was affected by this single defect and to correct that defect or, upon its failure to do so, to respond in damages to the City.

2. Upon Drake-Henne's failure to correct the defective compaction, we hold that it must answer in damages for the cost of repairing all resulting defects which were fairly, reasonably and directly attributable to the failure to compact, proved at the trial.

The workmanship was defective in that Drake-Henne had failed to compact the soil in the trenches in accordance with the requirements of the contract. This resulted in a settling of the soil and the resulting damage to the curb and gutter, pavement and other improvements. The failure to compact was discovered within the one-year period following completion of the project and Drake-Henne was advised thereof in writing. Further, Drake-Henne acknowledged its obligation under the warranty clause when, in July 1964, it attempted to correct the defective workmanship by employing a short-cut method, known as "mudjacking", to raise the displaced curb and gutter in place, but the attempt failed and, on the following day, it discontinued this work and no further attempts

were made to remedy the defective workmanship. It is our opinion that the city of Wahpeton satisfied its requirements of the warranty clause when it discovered and notified Drake-Henne, in writing, of the defective workmanship within one year after completion of the project. It then became the duty of Drake-Henne, under the warranty clause, to carry out its terms.

We find that the failure to compact to 95% of Proctor, as required by the specifications, is the *causal defect* and the proximate cause of the *resulting defects,* also referred to as "deficiencies", to wit, the settling of the curb and gutter, pavement and other improvements placed over and resting upon the insufficiently compacted soil within the trenches. The settling of the curb and gutter, pavement and other improvements located over the insufficiently compacted trenches are consequential damages, or resulting defects, which are referred to as "deficiencies" in a portion of the dissent. These deficiencies may be fairly and reasonably attributed to the single "causal defect", to wit, the failure to compact the trenches to 95% of Proctor. We believe that Drake-Henne is responsible for all consequential damages proved at the trial which may be fairly and reasonably attributed to the single causal defect, where, as here, notice of that causal defect was given within the one-year warranty period. The deficiency of compaction (the causal defect) is a latent defect which continued to manifest itself as time passed, even after the one-year period specified in the warranty clause, by the continuing settlement of curb and gutter, pavement, alley returns, storm sewers, catch basins, driveways and berm overlying the improperly compacted trenches and, it appears, was still manifesting itself at the time of trial. Drake-Henne was notified of the defect within one year after completion of the project, thus activating the warranty clause for all consequential damages (resulting defects) proved at the trial. There is no claim that these overlying improvements were defectively constructed and it is evident that had the trenches been compacted to within 95% of Proctor, as required by the specifications, the overlying improvements would not have settled or become disturbed. Thus, admittedly, there is but a single "causal defect", i. e., failure to compact to 95% of Proctor. Drake-Henne must be held responsible for the improper workmanship and the resulting defects or deficiencies directly resulting from its failure to perform.

The warranty clause of the contract provides that the contractor shall remedy defective workmanship within thirty days after notice in writing of the existence thereof shall have been given by the owner and "in the event of failure by the Contractor to do so, the Owner may remedy such defective workmanship * * * and in such event the Contractor shall pay the Owner the cost and expense thereof." This is in harmony with the measure of damages for breach of contract as provided by Section 32-03-09, N.D.C.C.:

"For the breach of an obligation arising from contract, the measure of damages, except when otherwise expressly provided by the laws of this state, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby or which in the ordinary course of things would be likely to result therefrom. No damages can be recovered for a breach of contract if they are not clearly ascertainable in both their nature and origin."

Thus we affirm the trial court's judgment which, in respect to this issue, provides:

"The preponderance of the evidence establishes that the defendant contractor's compaction was deficient and did not meet specification requirements with resulting damage to pavement, curb and gutter, and other incidental items.

* * * * * *

"The defendant Drake-Henne's breach of contract for failure to meet contract specification requirements was a proximate cause of the failure of pavement,

curb and gutter and resultant damage under consideration in this case.

\*   \*   \*   \*   \*   \*

"Compaction here was a latent defect, acceptance of which by the City does not preclude or estop the City from pressing its claim against the defendants.

\*   \*   \*   \*   \*   \*

"It is held that damages to be awarded the plaintiff is the amount which will compensate the plaintiff City for all detriment proximately caused by defendant Drake-Henne's default or which in the ordinary course of things will be likely to result therefrom."

We come now to the question of amount of damages. The trial court allowed the sum of $58,367.30. The City specifies that these damages are inadequate.

Several experts testified at the trial concerning the extent of the defect, and also concerning the cost of repair and restoration. The evidence establishes that 34,048 feet of trench is required to be disturbed and recompacted which runs parallel to and has caused curb and gutter to settle and become disturbed. One expert testified it would cost $12.20 per lineal foot to correct these defects, whereas another expert testified the cost would be $9.85 per lineal foot. It was also established that 16,082 feet of trench in the street over which pavement had been placed had become disturbed. One expert testified it would cost $15.-13 per lineal foot and the other testified it would cost $10.80 per lineal foot to correct this defect. The evidence also reveals that there are 2,026 feet of insufficiently compacted trenches in the boulevard which do not affect curb and gutter. According to one expert it would cost $4.10 per lineal foot to correct this defect; the other expert testified that the cost would be $3.20 per lineal foot. Based on these computations and accepting the lower estimates of cost to correct the defects, which cost figures were produced by one of the witnesses for the plaintiff, the damages to the City, proximately caused by failure of compaction, total $515,541.60.

We also allow as additional damages the amount of $2,250, allowed in the original opinion filed herein as a dissent, for items numbered 1, 2, 4 and 6 described in plaintiff's Exhibit HHH, but disallow damages for items numbered 3, 5, 7 and 8 for the reason that the plaintiff has failed to produce proof of damages as to these items. The items for which damages are allowed do not appear to have been caused by failure of compaction of the trenches containing the sewer or water mains.

For the reasons set forth herein we affirm the judgment of the trial court on the issue of liability and modify it as to the amount of damages awarded to the City, and direct that judgment be entered in favor of the City in the amount of $517,791.60, plus interest at the legal rate of four per cent per annum from and after the entry of judgment on mandate.

VOGEL and KNUDSON, JJ., concur.

ERICKSTAD, Chief Justice (dissenting).

I dissent for the reasons stated in the opinion filed in this court on August 10, 1973, which was signed by Justices Paulson, Knudson, and myself.

Now that Justice Knudson has had a change of mind following the rehearing on November 7, 1973, that opinion no longer speaks for a majority of our court. It nevertheless still expresses my views and retains the support of Justice Paulson.

Its retention, although only as a dissent, may illuminate the issues and perhaps also serve as a basis for discussion of some of the many problems in this field of the law.

PAULSON, J., concurs.

Syllabus to Opinion of Chief Justice Erickstad

1. Although backfill compaction was deficient at the time the certificate of completion was signed by the project engineer,

the City did not waive compliance with the contract specifications by the engineer's certification of completion and accordingly is not barred from recovering for defects resulting from the contractor's failure to perform according to the specifications, when defects were discovered during the one-year period as provided for in I(H)3.-(b) of the contract.

2. The pertinent provisions of the contract in the instant case limit recovery to damages for deficiencies discovered within the one-year period after the engineer certified completion of the contract.

3. When an appeal is taken pursuant to Section 28-27-32, N.D.C.C., and the appellant demands a trial de novo, the findings of the trial court must be given appreciable weight by the Supreme Court, especially when based upon testimony of witnesses who appeared in person before the trial court.

4. Considering Section 40-22-31, N.D.C.C., and the terms of the contractor's bond in the instant case in light of Sections 9-08-03 and 9-08-04, N.D.C.C., we conclude that the default referred to in Subsection 3 of Section 40-22-31, N.D.C.C., must amount to a complete failure of performance before the entire amount of the bond may be taken as a fixed and liquidated damage.

5. When two statutes relating to the same subject matter appear to be in conflict, they should be construed whenever possible to give effect to both statutes if this can be done without doing violence to either.

6. For reasons stated in the opinion, the City is entitled to recover $9,045 for the removal and replacement of deficient curb and gutter, and $2,250 for correcting other deficiencies, making a total of $11,-295, with interest at 4% per annum from August 5, 1964, and the case is remanded for further proceedings relative to the determination of the cost of correcting other deficiencies, incidental expenses, and interest at 4% per annum from August 5, 1964.

ERICKSTAD, Chief Justice.

This is an appeal by the defendants, Drake-Henne, Inc., a corporation; Johnson, Drake & Piper, Incorporated, a corporation (Drake-Henne's successor in interest); and American Casualty Company of Reading, Pennsylvania, a corporation (Drake-Henne's surety), and a cross-appeal by the plaintiff, City of Wahpeton, from a judgment for the City entered in the district court for $58,367.30, with interest and cost of suit.

Both parties have demanded a trial de novo under Section 28-27-32, N.D.C.C., which was in force at the time the appeal was taken. The appeal and cross-appeal were taken on December 10 and 12, 1968, and the effective date of repeal of Section 28-27-32, N.D.C.C., was July 1, 1971. The amendment of Rule 52(a) of our Rules of Civil Procedure did not become effective until August 1, 1971. Although Rule 86(a) may permit the application of amended Rule 52(a) retroactively, since we have not applied it in the past we will not apply it to this case. The case is therefore before us de novo.

On July 5, 1961, a contract was entered into between the City of Wahpeton and Drake-Henne, the low bidder for the project, for the construction of storm sewer, sanitary sewer and waterworks improvements in Water and Sewer District No. 3. On the same day John Dieseth Co. entered into a contract with the City of Wahpeton for the construction of curb and gutter, pavement, resealing and street widening in Street Improvement District No. 37. The specifications for both projects were prepared by North Central Engineers of Jamestown, North Dakota. North Central Engineers was also employed by the City as a consulting engineering firm for both projects.

A contract bond equal to the amount of Drake-Henne's bid, $628,999.64, was executed by Drake-Henne as principal and by American Casualty as surety.

Drake-Henne began work on the project on July 21, 1961. It was anticipated that the construction would extend over a two-year period.

In December of 1962 a final inspection of the project was conducted by North Central. At that time it was its recommendation that the amount held by the City of Wahpeton as a "retainage" be reduced to $5,000 and that this amount should be withheld until the completion of a few minor items of work.

By a letter dated July 11, 1963, D. R. Jesson, vice president and secretary-treasurer of Johnson, Drake & Piper, informed the City that Johnson, Drake & Piper had assumed all the liabilities and responsibilities of Drake-Henne pertaining to the construction contract for Water and Sewer District No. 3.

On August 5, 1963, North Central recommended that the final "retainage" be paid to Drake-Henne and that the one-year bond period of the contract commence as of that date.

As a result of a survey completed on April 3, 1964, North Central wrote Drake-Henne on May 6, 1964, demanding that Drake-Henne bring 2940 lineal feet of curb and gutter to grade. It also asked that eight other items be corrected. Negotiations were entered into and machinery was brought to the project to make corrections, but when the City became dissatisfied with the methods of correction employed, the City Council on July 21, 1964, declared Drake-Henne in default. This action was commenced on June 23, 1965.

North Central conducted another survey August 10–12, 1964, and wrote the Wahpeton City Attorney that settled curb and gutter had reached 3500 lineal feet. The result of a further survey taken in August, 1965, after this action was commenced, showed that settled curb and gutter had increased to 4645 lineal feet. At the time of the trial below, this total had further increased to 34,050 lineal feet.

In its complaint the City alleges that Drake-Henne failed to perform its obligations under the contract and that the project was completed in a defective manner as to workmanship and materials. It further alleges that Drake-Henne failed to repair or replace deficiencies which were discovered within one year after completion of the project; that the trenches were not maintained in a satisfactory condition for one year; and that the above noncompliance with the terms of the contract has resulted and is continuing to result in damage to curbs, gutters, pavement, sidewalks, alleys and driveways. Further, it alleges that the full amount of the surety bond furnished by American Casualty is due to the City of Wahpeton upon Drake-Henne's default as fixed and liquidated damages.

In answer the defendants assert, in part, that acceptance by the City of Wahpeton of the certification of completion of the project bars any action for default in performance of the contract; that such acceptance also bars recovery for any defects which were discovered or discoverable prior to August 5, 1963; that the provisions of the contract limit any recovery by the City to defects discovered during the one-year period from August 5, 1963, to August 5, 1964; that fixed and liquidated damages are recoverable only in the event of failure to perform the work; that any defects in the construction of the project are beyond the control of the defendants and are not their responsibility; and that John Dieseth Co. accepted the site conditions as they were at the time of construction of Street Improvement District No. 37, and is therefore responsible for any deficiencies which occurred after such acceptance.

In the Findings of Fact, Conclusions of Law, and Order for Judgment, the district court found that Drake-Henne was "to complete construction in strict accordance with the Plans, Specifications, and Construction Drawings," and that the phrase "strict accordance" means exact conformity; that the date of completion of Water and Sew-

er District No. 3 was August 5, 1964; that the preponderance of the evidence establishes that compaction of the trenches did not meet contract specifications, which resulted in damage to pavement, curb and gutter, and other incidental items; that Drake-Henne failed to meet contract specifications which the expert witnesses agreed could be met; that the failure to meet the contract specifications was a proximate cause of the failure of pavement, curb and gutter, and other items; that Drake-Henne's responsibility to comply with the specifications was not affected by North Central's omission of compaction tests or by John Dieseth Co.'s acceptance of the site; that the principles of law of Hutchinson v. Bohnsack School District, 51 N.D. 165, 199 N.W. 484 (1924), are controlling on the issue of waiver, and that the contract provisions providing for approval of completed units of the project for purposes of payment, issuance of the final certificate, payment thereunder, and use of the completed work do not constitute a waiver of any claim by the City arising from faulty workmanship, use of defective materials, or failure to meet contract specifications; that acceptance by the City did not constitute a waiver of the specification requiring compaction to be 95% of Proctor, or of the warranty and guaranty provisions of the contract; that the deficient compaction was a latent defect, acceptance of which does not preclude or estop the City in its claim; that North Central notified Drake-Henne by letter on May 6, 1964, of an alleged 2940 feet of failed curb and gutter and eight other deficient items, which letter constituted sufficient notice within both the warranty and guaranty clauses; that the afore-mentioned also constituted sufficient notice of deficiencies which would develop beyond the one-year warranty period; that the developing deficiencies, which reached 34,050 feet of failed curb and gutter at the time of trial, were an occurring condition and, given the facts, should have been expected and contemplated; that because recovery of damages under the guaranty clause would be restricted to deficiencies which were evident during the one-year period, damages are decreed under the warranty clause, which is not so restricted; that the City is entitled to damages in an amount which will compensate for all detriment proximately caused by Drake-Henne's default, and that amount is $58,367.30, together with interest and costs of suit.

Drake-Henne has presented its argument as three issues, which we will examine separately, not necessarily in the order followed by Drake-Henne. The first two issues concern the legal effect of the contract between Drake-Henne and the City.

"I.

"The Court erred in applying the rule of law set out in the North Dakota case of Hutchinson v. Bohnsack School District, 51 N.D. 165, 199 N.W. 484, under the terms and conditions of the contract between the parties to this lawsuit."

In *Bohnsack* the plaintiff contractors entered a contract with the defendant school district to provide and install a hot-water heating plant in the schoolhouse. During installation of the plant the contractors were unable to install certain pipes in compliance with the plans and specifications. The architect employed by the school district then gave directions as to how the pipes should be installed, which directions were followed by the contractors. After installation of the plant the architect issued a final certificate to the contractors, and the school district paid for and accepted the plant. Two months later the contractors made certain repairs to the plant at the request of the school district. The contractors then brought an action to recover the reasonable value of the repairs.

The school district alleged in its answer that it was not liable for the cost of the repairs because they were necessitated by the contractors' failure to comply with the plans and specifications.

The pertinent provisions in the contract read:

" 'Article 3. The architect shall furnish with reasonable promptness additional instructions by means of drawings or otherwise necessary for the proper execution of the work. * * * In giving such additional instructions the architect shall have authority to make minor changes in the work not involving extra cost and not inconsistent with the purposes of the building.'

" 'Article 9. The architect shall have general supervision and direction of the work. He is the agent of the owner only to the extent provided in the contract documents, and when in special instances he is authorized by the owner so to act; and in such instances he shall, upon request, show the contractor written authority. He has authority to stop the work whenever such stoppage may be necessary to insure the proper execution of the contract.

\* \* \* \* \* \*

" 'Article 16. Neither the final certificate nor payment nor any provision in the contract document shall relieve the contractor of responsibility for faulty materials or workmanship, and he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom which shall appear within a period of two years from the time of installation. * * *'

\* \* \* \* \* \*

" 'Article 27. * * *

" 'No certificate issued nor payment made to the contractor nor partial or entire use or occupancy of the work by the owner shall be an acceptance of any work or materials not in accordance with this contract. The making and acceptance of the final payment shall constitute a waiver of all claims by the owner otherwise than under articles 16 and 29 of these conditions, or under requirements of the specifications, and of all claims by the contractor except those previously made and still unsettled.' " Hutchinson v. Bohnsack School District, *supra,* 199 N.W. 484 at 485.

The specifications in *Bohnsack* included the following:

"Page 12M. 'The contractor agrees to hold himself responsible for any defects which may develop in any part of the installation furnished by him, and to replace and make good without expense to the owner any such faulty parts during a period of one year from the day of final acceptance of the work. The acceptance of the installation will not waive this guarantee.' ". Hutchinson v. Bohnsack School District, *supra,* 199 N.W. 484 at 485.

On appeal in *Bohnsack,* this court held that the provisions of the contract and specifications make it "plain that the issuance of the final certificate, payment thereunder, and the use of the work does not waive any claim because of faulty materials or workmanship or on account of failure to comply * * * with the specifications". Hutchinson v. Bohnsack School District, *supra,* 199 N.W. 484 at 486.

Drake-Henne contends that the rule of law set out in *Bohnsack* is not applicable. It argues that if compaction was deficient at the time the certificate of completion was signed by the engineer, this fact was known or should have been known by the engineer, the City's agent, and constituted a waiver of compliance with the specifications. Because the engineer knew or should have known of the defective compaction, Drake-Henne asserts that the defect was patent.

Pertinent are the following provisions in the Drake-Henne contract:

Part I(H)3. (a): "The acceptance of any workmanship, materials, or equipment by the Engineer shall not preclude the subsequent rejection thereof if such workmanship, materials or equipment shall be found to be defective after de-

livery or installation, and any such workmanship, materials, or equipment found defective before final acceptance of the construction shall be remedied or replaced, as the case may be, by and at the expense of the Contractor. Any condemned material or equipment shall be immediately removed from the site of the Project by the Contractor at the Contractor's expense. The Contractor shall not be entitled to any payment hereunder so long as any defective workmanship, materials or equipment in respect to the Project, of which the Contractor shall have had notice, shall not have been remedied or replaced as the case may be." Plaintiff's Exhibit "I".

Part I(H)3.(b): "Notwithstanding any certificate which may have been given by the Engineer, if any workmanship, material or equipment which does not comply with the requirements of this Contract shall be discovered within one (1) year after completion of the Project the Contractor shall remedy any such defective workmanship or replace such defective materials or equipment within thirty (30) days after notice in writing of the existence thereof shall have been given by the Owner. In the event of failure by the Contractor to do so, the Owner may remedy such defective workmanship or replace such defective materials, or equipment, as the case may be, and in such event the Contractor shall pay the Owner the cost and expense thereof." Plaintiff's Exhibit "I".

Part I(J)2.(a): "Upon written request of the Owner the Contractor shall deliver to the Owner full possession and control of any section of the Project provided the Contractor shall have been paid at least ninety percent (90%) of the cost of construction of each section. Upon such delivery of the Possession and control of any section of the Project to the Owner the risk and obligations of the Contractor as set forth in I(J)1.(b)(6), hereof with respect to such section of the Project so delivered to the Owner shall be

terminated: PROVIDED, HOWEVER, that nothing herein contained shall relieve the Contractor of any liability with respect to defective workmanship or materials as contained in I(H)3. hereof." Plaintiff's Exhibit "I".

The City urges that the clear meaning of these provisions is that acceptance of the engineer's certificate of completion, and possession and control of the project by the City do not constitute a waiver of any claim for defective workmanship, materials or equipment.

In support of its position, Drake-Henne refers us to City of Granville v. Kovash, Inc., 118 N.W.2d 354 (N.D.1962).

In *Kovash* the City brought an action to recover for damages resulting from the contractor's failure to construct and install a water and sewerage system in accordance with the contract. One of the provisions in the contract was that the water mains were to be laid at a depth of seven and one-half feet below the surface of the ground. The contract also provided that the project engineer for the City was to have complete supervision of the work and that final payment would be made after the project engineer had certified to the City that the work had been completed in a satisfactory manner and in accordance with the terms of the contract.

After final certification by the project engineer and final payment by the City at a time when service connections were made, it was discovered that some of the water mains had been laid at depths less than what the contract required. During the following winter some of these lines froze and broke. The City demanded that Kovash repair the damage and upon its refusal brought an action against Kovash. The trial court found for the City.

A pertinent part of the defense was that the system had been constructed and completed under the supervision of the project engineer, or his inspector, and that the terms of the contract made his approval of

the work and its acceptance final and conclusive, in the absence of fraud, collusion, or of a mistake so gross as to imply bad faith.

This court agreed with that contention, saying:

"Here, the contract specifically provided that the engineer would supervise the work and would see that such work was done according to the contract provisions; his certificate approving the work and the manner of performance and the City's action in accepting such certificate of approval are conclusive on the parties." City of Granville v. Kovash, Inc., 118 N.W.2d 354 at 360 (N.D.1962).

*Kovash* goes on to say that *Bohnsack* is not applicable because there was no provision in the contract between the City and Kovash comparable to Article 27 of the *Bohnsack* contract. That article read: "No certificate issued nor payment made to the contractor nor partial use or occupancy of the work by the owner shall be an acceptance of any work or materials not in accordance with this contract."

Drake-Henne asserts that although the warranty provision in the instant case, I(H)3.(b), is similar to Article 27, it can be distinguished on the ground that it contains additional language which makes it applicable only to noncompliance with the specifications which is not discovered or capable of being discovered until after final completion. Drake-Henne contends that the defective compaction in the instant case was patent and therefore known by the City or discoverable with use of reasonable care.

An examination of the language in the *Bohnsack* contract reveals that it is equivalent to the language in the contract before us.

The court in *Kovash* should have referred to Article 16 rather than Article 27 in its discussion of that case. That portion of Article 27 quoted in *Kovash* has reference to those events taking place before making and acceptance of final payment, more comparable to I(H)3.(a) of the Drake-Henne contract. The phrase "which shall appear," in Article 16 of *Bohnsack,* has a meaning similar to the phrase "shall be discovered," in I(H)3.(b).

However, the question presented by the assertion that this phrase makes the provision applicable only to noncompliance which is not discovered or capable of being discovered until after final completion was not before the court in *Bohnsack.* Drake-Henne supports its position with a decision by the Montana Supreme Court Grass Range High School District v. Wallace Diteman, Inc., 155 Mont. 10, 465 P.2d 814 (1970).

In *Grass Range* the school district brought an action against the contractor for damages caused by the alleged faulty construction of a gymnasium floor. The pertinent provision of the contract reads:

" 'The Contractor shall remedy any defects due to faulty material or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment * * *.' " Grass Range High School District v. Wallace Diteman, Inc., *supra,* 465 P.2d 814 at 816.

Reversing the trial court's judgment for the school district, the supreme court held that the above clause did not cover "defects existing at the date of acceptance, or defects that appeared later than one year after final payment." Grass Range High School District v. Wallace Diteman, Inc., *supra,* 465 P.2d 814 at 816.

In concluding that the school district waived all patent defects existing at the time of the acceptance of the building, the court said:

"In this instance the floor did not contain latent defects that would later appear to cause the school district unsus-

pected difficulties; objections were made to the condition of the floor at the final inspection and these objections were incorporated in the punch list. The items objected to were corrected to the satisfaction of the architects and they issued their final certificate as provided for in the agreement between contractor and owner.

\*　　\*　　\*　　\*　　\*　　\*

"The school district subsequently ratified the architects' acceptance of the building by issuing the final payment. There were no conditions contained in the certificate of acceptance nor in the school district's final payment, even though architect Loners acknowledged they could have used other forms containing conditions. The payment was final and the acceptance was final. There were no objections, reservations, or conditions inserted in the final acceptance and the school district must be deemed to have accepted the floor as it existed at that time." Grass Range High School District v. Wallace Diteman, Inc., *supra,* 465 P.2d 814 at 816, 817.

In *Grass Range* the school board knew that the defects were in the floor at the date of final acceptance. Drake-Henne thus argues that if its compaction did not comply with the specifications this was known to North Central, and such defect was therefore waived by North Central as agent for the City, because acceptance and final payment were made on an unconditional basis as in *Kovash* and *Grass Range.*

In reply the City calls our attention to School District No. 65R of Lincoln County v. Universal Surety Company, 178 Neb. 746, 135 N.W.2d 232 (1965).

*Universal Surety* was an action by the school district against the surety on the contractor's performance bond. The construction took place in 1955 and 1956. The architect authorized final payment on the contract after inspecting the building. Final payment was made by the school board in November and December 1956 and the defects were discovered in about March 1957.

The lower court entered judgment for the school district for the reasonable cost of remedying the defects and for failure to build in accordance with the specifications. On appeal, this judgment was affirmed with an allowance for additional attorney fees.

In answer to the argument that the architect was negligent in not discovering the defects before issuing the final certificate and that responsibility for the defects was therefore imputed to the school district, the court said:

"We point out that Article 9 of the specifications provides that the architect is not the agent of the owner except as especially provided. The surety is bound by Articles 16 and 27, hereinbefore quoted and now referred to, which specifically protect the School District owner and reserve to it its right of recovery for negligence, faulty workmanship, and failure to build in accordance with the specifications, despite the final certificate of the architect, the making or acceptance of payment, or the entire use and occupancy of the property. The contention of the defendant would require us to rewrite this contract. The contract does not bind the owner for failure of the architect to discover the defects involved here. On the contrary, it provides a plan for inspecting and checking by an architect for the mutual benefit of both parties. The contract language quoted reserves to the School District owner the right to recover and no exception is provided for the failure of the architect to discover the defects. If the parties intended that the architect's certificate or approval be binding or that the owner would be bound by failure of the architect to discover the defects, it would have been easy to include this in the terms of the contract."

School Dist. No. 65R v. Universal Surety Co., *supra,* 135 N.W.2d 232 at 235, 236.

The court concluded this answer with a discussion of *Bohnsack* as a case directly in point.

■ In light of *Universal Surety* we are of the opinion that it was not error for the trial court to apply the rule of law set out in *Bohnsack* to the facts of this case. The contractual provisions in all three instances are similar. If compaction was deficient at the time the certificate of completion was signed by the engineer, the City did not waive compliance with the specifications and is not barred from recovering for defects discovered during the one-year period as provided for in I(H)3. (b).

Drake-Henne's second issue follows:

"II.

"The trial court erred, under the terms of the contract, in awarding damages to the city of Wahpeton on the basis of allegedly defective workmanship discovered more than one year after final completion and acceptance of the project."

The court denominated Part I(H)3. (b) of the specifications, which appears on page 906 of this opinion, as the warranty clause and Part III(B)10. (h) of the specifications as the guaranty clause.

"In all areas the Contractor shall maintain the trenches in a satisfactory condition for a one year period. If settlement occurs in paved areas after the pavement has been replaced, the pavement shall again be removed, the base compacted and new pavement placed at the Contractor's expense." Part III(B) 10. (h).

The trial court decreed damages under the warranty clause, asserting that only under it could the City recover for deficiencies discovered more than one year after completion of the project.

Drake-Henne contends that the trial court's finding increased and expanded its responsibilities and liabilities beyond those assumed under the contract. Although we are not certain, as the court did not explain in detail how it arrived at the amount of the award, we believe that it relied upon Plaintiff's Exhibit HHHH, which is a copy of a letter written by a representative of North Central Engineers to the City Auditor on August 31, 1965, detailing the deficiency and the costs of correcting same. Said Exhibit reads as follows:

"Following is our estimate of cost to correct the deficiencies on the reference project.

| | | | |
|---|---|---|---|
| Remove and Replace Curb and Gutter | 4,645 L.F. | @ $4.50 | $20,902.50 |
| Remove and Replace Pavement | 1,548 S.Y. | @ $8.00 | 12,384.00 |
| Remove and Replace Sidewalk | 3,610 S.F. | @ $1.00 | 3,610.00 |
| Remove and Replace Alley Returns | 27 S.Y. | @ $8.00 | 216.00 |
| Remove and Replace Driveways | 95 S.Y. | @ $8.00 | 760.00 |
| Resodding and Top Dressing | 4,040 S.Y. | @ $0.50 | 2,020.00 |
| Plumb Gate Valves | 10 EA. | @ 30.00 | 300.00 |
| Second Avenue North Outfall | Lump Sum | $4,000.00 | 4,000.00 |
| | Total Construction Cost | | $44,192.50 |
| | Costs | | 8,838.50 |
| | Total | | $53,031.00" |

As that letter covers 4645 lineal feet of curb and gutter, and we know from Plaintiff's Exhibit HHH–1 that only 2990 lineal feet of deficient curb and gutter was dis-

covered within the one-year period following certification of completion of the project on August 5, 1963, the court included in the award the cost of repairing deficiencies discovered after the one-year period. Was the trial court right in doing so? We think not.

The trial court apparently relied upon a decision of the Appellate Division of the Supreme Court of New York for its holding that recovery could extend to deficiencies discovered beyond the one-year period following completion of the project.

In Town of Tonawanda v. Stapell, Mumm & Beals Corp., 240 App.Div. 472, 270 N.Y.S. 377, aff'd, 265 N.Y. 630, 193 N.E. 419 (1934), the case relied upon by the trial court in the instant case, the New York court reversed a lower court decision which held that, under the terms of a contract between the town and the contractor for the construction of street paving and curbing, the contractor is not liable for latent defects in the work which develop or are discovered after the expiration of one year from the date of completion and acceptance of the work. The pertinent provisions of the New York contract read:

"29. 'The Contractor, shall complete the work or improvements in a satisfactory and durable manner so as not to require repairs within one year from the date of completion of the contract; the Contractor shall during the said year make all repairs as may be necessary on account of improper or unskillful workmanship or the use of defective or imperfect material, and the contract bond shall remain in effect until the expiration of this one year period.'

\* \* \* \* \* \*

" 'The Contractor further agrees to keep and maintain the pavement hereinbefore referred to, together with its appurtenances in good condition and repair for one year from the date of the completion and acceptance of the same, in accordance with the conditions of the specifications and contract, \* \* \* ' "

Town of Tonawanda v. Stapell, Mumm & Beals Corp., 147 Misc. 768, 264 N.Y.S. 424 at 426, 427 (1933).

The lower court decision was reversed on the ground that latent defects constitute a breach of contract for which the owner has a cause of action independent of any remedy provided for in the contract. The appellate division opinion reads in part:

"To modify and to effect the rule of damage in any respect, there should be a clear and unequivocal provision of the contract. There is an absence of any such here. Construing the contract as a whole, we hold that plaintiff is entitled to recover the amount of damages it suffered by reason of the failure of defendant to fulfill its contract, without limitation in time or amount." Town of Tonawanda v. Stapell, Mumm & Beals Corp., *supra*, 270 N.Y.S. 377 at 379.

Viewing the pertinent Drake-Henne contract provisions, we conclude that they clearly and unequivocally limit recovery to defects discovered within one year of the completion of the project. In the instant case the contract states, and the trial court found, that Drake-Henne was to complete construction in strict accordance with the plans, specifications, and construction drawings, which are all part of the contract. Included in the specifications is the warranty provisions, I(H)3.(b), and both parties are bound by the language therein.

The City, in support of its argument that it may recover for any breach of contract which may be discovered within the six-year statute of limitations in Section 28–01–16, N.D.C.C., refers us to a discussion in "The A.I.A. Standard Contract Forms and the Law" by Parker & Adams (1954), in which article 20 of the A.I.A. Standard Contract Forms is construed. The City contends that I(H)3. (a) of the Drake-Henne contract is similar to article 20 of the A.I.A. Standard Contract Forms. We disagree.

Part I(H)3. (a) refers to acceptance of workmanship, materials and equipment by

the engineer in the course of construction prior to final acceptance of the completed project. Article 20 includes a provision detailing the contractor's duty in the period following final acceptance.

*"Art. 20. Correction of Work After Final Payment.*—Neither the final certificate nor payment nor any provision in the Contract Documents shall relieve the Contractor of responsibility for faulty materials or workmanship and, unless otherwise specified, he shall remedy any defects due thereto and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of substantial completion. * * *" The A.I.A. Standard Contract Forms and the Law, by Parker & Adams (1954).

Also pertinent is article 25 of the A.I.A. Standard Contract Form, which reads in part:

"No certificate issued nor payment made to the Contractor, nor partial or entire use or occupancy of the work by the Owner, shall be an acceptance of any work or materials not in accordance with this contract. The making and acceptance of the final payment shall constitute a waiver of all claims by the Owner, other than those arising from unsettled liens, from faulty work appearing after final payment or from requirement of the specifications, and of all claims by the Contractor, except those previously made and still unsettled."

Parker and Adams assert that under the language of the first sentence of this paragraph of article 25 the duration of the contractor's liability is determined by the appropriate State's statute of limitation and that there is no reason to insert similar language in the first sentence in article 20 if the intent of the remainder of that sentence is to limit the contractor's responsibility for defects to a one-year period.

"It has been suggested that the specific provision requiring the correction of defects that appear within a year of substantial completion limits the contractor's responsibility for defective work to that period, in spite of the more general provision in the first phrase of the sentence and the similar broad provision in the second paragraph of Article 25. No court decision is known to have passed upon this point. The legal maxim that where a specific and a general provision are in conflict, the specific shall prevail may raise some doubt as to what a court might decide, but it does not seem sound to read into this provision an intent to void the broad generalities of the immediately preceding clause and the clear statement in Article 25 that *'no certificate issued nor payment made* to the Contractor, nor partial or entire use or occupancy of the work by the Owner, *shall be an acceptance of any work or materials not in accordance with this contract.'*

"The statute of limitations in a given state would determine the duration of the Contractor's responsibility under this broad provision. There would be no reason for the insertion of this provision in Article 25 nor the similar provision in Article 20 if the intention were to limit the Contractor's responsibility for defects to the one year period named in Article 20. It seems more reasonable to interpret the provision requiring correction of defects appearing within a year as constituting a specific contractual liability that would be covered by a guaranty bond which would cease to be in effect long before the end of the period established by the Statute of Limitations." Article 20, Analysis, The A.I.A. Standard Contract Forms and the Law, by Parker & Adams (1954).

Parker and Adams are cited with approval in City of Midland v. Waller, 430 S.W.2d 473 (Tex.1968), and Burton-Dixie Corp. v. Timothy McCarthy Const. Co., 436 F.2d 405 (5th Cir. 1971).

The contract under discussion in *City of Midland* contains both article 20 and arti-

cle 25 of the A.I.A. Standard Contract Form. The pertinent provision of the contract in *Burton-Dixie,* article 20, reads in part:

"The Contractor shall remedy any defects due to faulty materials or workmanship and pay for any damage to other work resulting therefrom, which shall appear within a period of one year from the date of final payment, or from the date of the Owner's substantial usage or occupancy of the project, whichever is earlier, and in accordance with the terms of any special guarantees provided in the contract. *Neither the foregoing nor any provision in the contract documents, nor any special guarantee time limit, shall be held to limit the Contractor's liability for defects, to less than the legal limit of liability in accordance with the law of the place of building.* The Owner shall give notice of observed defects with reasonable promptness." Burton-Dixie Corp. v. Timothy McCarthy Const. Co., 436 F.2d 405 at 409, fn. 3 (5th Cir. 1971). [Emphasis added.]

We believe the sentence we have italicized in the *Burton-Dixie* contract clearly distinguishes that contract from the Drake-Henne contract.

Article 25 of the A.I.A. Standard Contract Form contains no provision limiting the contractor's liability to defects discovered *before* final acceptance as does Part I(H)3.(a), nor does it contain a provision limiting the contractor's liability to defects discovered within one year of the completion of the project as does Part I(H)3. (b). Article 25 therefore differentiates, when considered in the light of the language of article 20, the terms of the A.I.A. Standard Contract Form from Part I(H)3. of the Drake-Henne contract.

Had the parties to the instant contract desired the contractor's responsibility to extend to defects discovered within the full period of the statute of limitation applicable to contracts generally, they could very easily have so provided by using the language incorporated in the *Burton-Dixie* contract, or, although obviously less clear, they could have used the language of articles 20 and 25 of the A.I.A. Standard Contract Form. They did neither.

We conclude from our study that the City's recovery is limited to deficiencies discovered within the one-year period following completion of the project. Recovery is therefore limited in this case to deficiencies discovered prior to August 5, 1964.

Our next pursuit must be to determine the extent of the City's damages, if any, in light of that limitation. The determination of that issue, namely liability for defective workmanship and material and the extent thereof, is encompassed in Drake-Henne's third issue.

"III.

"The City of Wahpeton failed to prove, by a fair preponderance of the evidence, that Drake-Henne's compaction of water main and storm sewer trenches was deficient and not in accordance with contract specifications."

The pertinent contract specifications read:

"(a) Storm Sewer, Manholes and Inlet Leads—After pipe has been approved, backfilling shall be done with approved material free from large clods. Backfill material shall be placed evenly and carefully around and over the pipe in 6" maximum layers. Each layer shall be thoroughly and carefully rammed until 1 ft. of cover exists over the pipe. The remainder of the backfill shall be placed in 8" maximum layers. All backfill shall be compacted to a density equal to 95% of the maximum dry density at optimum moisture using the Standard Proctor Method so that pavement or curb and gutter can be placed immediately." III(B)10.(a).

"(b) Water main, hydrant leads and copper service lines—After the pipe has

been tested and approved, backfilling shall be done with approved material free from large clods. Backfill material shall be placed evenly and carefully around and over the pipe in six inch layers until one foot of cover exists over the pipe. Where placing the above pipe under paved areas or areas to be paved the remainder of the backfill shall be placed in 8″ maximum layers. All backfill shall be compacted to 95% of maximum dry density at the optimum moisture content using the Standard Procter Method. Where placing water main in other areas compaction of the remainder of the backfill shall be as directed by the Engineer to insure a minimum of settlement." III(B)10.(b).

The only compaction testing which took place during the construction period was conducted under the direction of Ross Milne, an employee of North Central, beginning on August 16, 1961, and ending on August 31, 1961. Thirty-four areas were tested on 2nd Avenue North between 1st Street North and 10th Street North. The results indicated that compaction at twenty-seven of the locations did not meet the specifications. These areas were apparently recompacted and not tested again until 1966.

Art Thompson, the job superintendent for Drake-Henne on this project, testified that he was not furnished with written results of the testing but that they were made known to him orally. He stated that the areas which were not compacted properly were recompacted, but that no further tests were conducted by either Drake-Henne or North Central during the construction period.

On February 28, 1966, Robert Muscha, a civil engineer employed by Robert J. Roberts of Moorhead, Minnesota, drilled test holes in the city of Wahpeton under the direction of Art Thompson, the job superintendent for Drake-Henne on the project. These test borings were obtained at the request of Dr. Suresh Brahma, who testified as an expert witness on behalf of Drake-Henne.

Dr. Brama testified that without knowledge of both the moisture content at the time of compaction and the history of the area from 1961 through 1965, the Proctor density in 1961 could not be determined by testing in 1965. He said that the present condition of the project was the natural result of using the type of soil found in the Wahpeton area as backfill even if compacted according to the specifications.

Dr. James Jorgenson, an assistant professor of civil engineering at North Dakota State University, testifying as an expert, stated it was his opinion that Proctor density tests taken in 1966 would not be give an accurate indication of soil density and compaction in 1961 and 1962. He also testified that test results in 1966 could be either higher or lower than those which would have been obtained in 1961 and 1962. More specifically, he stated that it was possible that soil compacted to 95% of Proctor in 1961 or 1962 could test at 73% of Proctor in 1966 and that this abrupt change in density could also take place over one winter in this area.

John L. McCormack, Jr., the president of Northern Improvement Company, testified that it had been his experience that the density of excavated soil as found in the Wahpeton area would change from the end of the construction year in the fall to the next spring. He also stated that it is natural to expect heaving and settlement when this type of soil is used as backfill even if compacted according to the specifications.

Oscar Manz, an associate professor of civil engineering at the University of North Dakota, testified as an expert witness for the City of Wahpeton. In February 1966 under his direction soil samples were obtained from twenty-two test holes. The test-hole locations were in both disturbed and undisturbed soil, i. e., in trenches and adjacent to trenches. Sixteen of the test holes were in disturbed soil. Twenty-seven soil samples were taken

from these holes and the percentage of Proctor was calculated for ten of these, all of which were less than 95% of Proctor, varying from 73% to 93%. Of the nine samples taken from undisturbed soil, six were less than 95% of Proctor, varying from 82% to 94%.

Mr. Manz testified that the density of the soil at the time the tests were made would be greater than it was at the time the soil was compacted, because of settling and consolidation. He also stated that if the trenches had been compacted to 95% of Proctor in 1961 and 1962 there would have been no subsequent settlement.

Ross Milne testified that the defects which had appeared by August 5, 1964, were the result of poor compaction and that as a result of this poor compaction the quantity of the defects was increasing. It was his opinion that the results of Proctor tests in 1966 would be substantially the same as the results of Proctor tests in 1961 had tests then been taken.

Norm Henning, a civil engineer and one of the owners of Twin City Testing and Engineering Laboratory, Inc., gave testimony concerning solid tests made by that company in 1966. These tests consisted of thirteen test borings taken at different locations. One to six soil samples were obtained at different depths from each boring. Of the twenty-nine samples taken in disturbed soil, twenty-two were less than 95% of Proctor, varying from 73% to 94%. Of the eight samples in undisturbed soil, six were less than 95% of Proctor, varying from 86% to 94%. He stated that the tests would not indicate anything about the moisture content at the time the trenches were filled but that the density will be greater now if there has been settlement or consolidation of the soil.

Richard J. Fiala, a consulting engineer with K. D. Mackiehan and Associates, testified that in his opinion the cause of the defects was improper backfilling and consolidation of the trenches.

It is apparent from the foregoing summary of the testimony that the witnesses for Drake-Henne did not agree with the witnesses for the City who testified that the compaction tests made in 1966 show that the backfill in Drake-Henne's trenches was not properly compacted and that the deficiencies in the work were due to this improper compaction.

Drake-Henne contends that almost total reliance for the expert opinions that compaction did not meet the specifications was based upon tests taken four or five years after the construction and that the record reflects the deficiencies and unreliability of these tests. Drake-Henne also contends that the record is not clear as to whether the compaction of the test samples was to be 95% of Proctor or "as directed by the Engineer," which is the compaction requirement of III(B)10.(b) for backfill in water main trenches other than under paved areas or areas to be paved.

The trial court found that Drake-Henne's compaction of the backfill was deficient and that this deficiency resulted in defective workmanship, for which the court awarded $58,367.30 in damages, with interest and costs of suit.

The damages seem to be based upon deficiencies and eight cost items contained in Plaintiff's Exhibit HHHH, quoted at page 909 of this opinion.

█ Applying the rule that the trial court's findings in a trial de novo are entitled to appreciable weight, especially where the witnesses have appeared and testified in person before the trial court, we conclude that the trial court's findings that the compaction did not satisfy the specifications of the contract are correct. Bjerken v. Ames, 189 N.W.2d 366, 372 (N.E. 1971); Sorenson v. Leslie, 186 N.W.2d 454, Syllabus ¶ 1 (N.D.1971).

Since the trial court allowed damages for deficiencies discovered more than one year after the completion of the contract, the award must be modified to the extent

that it allows damages for those deficiencies.

The deficiencies discovered during the one-year period following substantial completion of the contract are described in Plaintiff's Exhibits HHH and HHH-1.

The deficiencies listed in Plaintiff's Exhibit HHH are as follows:

"1. Raise catch basin at 818 Sixth Avenue North on the north side of the ,Avenue.

"2. Riprap the Second Avenue North storm sewer outfall line.

"3. Fix the settled driveway at 304 and 312 Second Street South (double drive).

"4. Replace the driveway just north of Hausauer Beverage Company on Sixth Street South.

"5. Raise the slab to grade over the top of the storm sewer-main across Sixth Street South between Third Avenue South and the Great Northern Railway.

"6. Raise the gate valve to grade on Ninth Street and Third Avenue North (NW radius).

"7. General sodding and berm dressing on reference project. (As discussed with you in Wahpeton.)

"8. Fix the fence in the park east of First Street North."

Eddie Johnson, who was an employee of North Central on this project beginning in June 1962, and who became the City Engineer for Wahpeton in April 1965, was questioned specifically on all items except Nos. 6 and 8. He stated that no work was done by either Drake-Henne or Johnson, Drake & Piper after July 22, 1964, although some individual property owners had resodded and top dressed their own boulevards, and the City had made some minor repairs.

Mr. Johnson testified that No. 1 is a simple maintenance item that would cost about thirty or forty dollars to repair.

He stated that some riprap had been placed at the Second Avenue North outfall, item No. 2, in the spring of 1964, but in Plaintiff's Exhibit CCCC, a report from North Central to the City Attorney, dated October 16, 1964, Mr. Johnson stated that this was not done soon enough and that a new outfall structure is required.

North Central, in Plaintiff's Exhibit HHHH, places the cost of such a new structure at $4,000. Drake-Henne offered Defendant's Exhibit 29 in support of its contention that the outfall could be replaced at under $1,000.

As the replacement as outlined by Mr. Johnson would involve an improvement over what existed prior to the damage resulting from Drake-Henne's negligence and as he testified that he informed the City Council that North Central believed Drake-Henne's equitable share would be one-half the cost, we conclude that $2,000 would be a reasonable contribution toward the correction of this item.

With respect to No. 3, Mr. Johnson did not know what the cost would be, but stated that the cost for No. 4 would be about $180. He stated further that No. 5 is not a major item.

Plaintiff's Exhibit HHHH places the cost of plumbing a gate valve, No. 6, at $30.

Mr. Johnson testified that he did not know the exact quantities involved in No. 7, but his opinion was that it involved 30–40% of the project area. Of this amount he said that about 80% needed top dressing and 20% needed to be sodded. He gave no cost figures.

No testimony was received relative to the cost of deficiencies described in item No. 8.

We conclude that the cost of correcting the deficiencies described in items 1, 2, 4, and 6 is $2,250.

Because the record does not contain evidence from which we may determine the cost of correcting deficiencies described in items 3, 5, 7, and 8, we believe it necessary to remand this case to the trial court so that it may conduct a further hearing to determine the cost of correcting these deficiencies.

Plaintiff's Exhibit HHH–1, as corrected during the proceedings in the lower court, shows the locations of 2990 lineal feet of deficient curb and gutter. Drake-Henne contends that it is responsible for only 500 lineal feet of the deficient curb and gutter listed in this exhibit.

Defendant's Exhibit 25 shows that 710 lineal feet of defective curb and gutter are in areas where no trench work was done by Drake-Henne. We agree that Drake-Henne should not be held responsible for those deficiencies.

Defendant's Exhibit 26 discloses that 720 lineal feet of deficient curb and gutter are in areas where the center of the water main trench is 3 to 5.5 feet from the curb facing. Plaintiff's Exhibit L shows this, plus an additional 680 lineal feet of defective curb and gutter in areas where the center of the water main trench is 1 to 5 feet from the curb facing.

Drake-Henne contends that it is not responsible for this 1400 lineal feet of deficiencies, because compaction in these areas was to be "as directed by the Engineer," under III(B)10.(b) of the contract specifications, quoted herein at page 912.

Ross Milne testified that the width of these trenches is from 18 to 30 inches at the bottom and from 5 to 6 feet at the top, and that the back of the curb would be 6 inches closer to the center of the trench than the face of the curb.

Art Thompson testified that Drake-Henne did not make it a practice to trench in a "V" manner, as stated by Mr. Milne, but that cave-ins did occur which caused the top of the trench to increase in width as much as two feet or possibly more in some instances.

Although Drake-Henne's argument is not completely without merit, we believe that the trial court was in a much better position than we are in to decide the issue. Since it decided to the contrary, unless that finding was clearly erroneous we will not set it aside. See Rule 52(a), N.D.R. Civ.P. Accordingly, we conclude that Drake-Henne is responsible for this 1400 feet of defective curb and gutter.

Finally, Drake-Henne argues that it is not responsible for 670 lineal feet of deficient curb and gutter located on Second Avenue North where John Dieseth Co. widened both sides of the street and installed new curb and gutter over the trenches after backfilling and compaction were completed. We do not agree. As stated hereinbefore, the acceptance of Drake-Henne's work by the City is not a waiver of compliance with the specifications. It is further our view that the deficiencies in those areas were due to the deficiencies in compaction in the trenches dug by Drake-Henne and not to the activities of John Dieseth Co.

However, a comparison of Plaintiff's Exhibit HHH–1 with Plaintiff's Exhibit D reveals that there is 270 lineal feet of deficient curb and gutter on Second Avenue North where there was no trenching done by Drake-Henne, and for which Drake-Henne is therefore not responsible.

As for the cost of removal and replacement of curb and gutter, we accept the testimony of Mr. Milne that $4.50 per lineal foot is reasonable.

We find that of the 2990 lineal feet of deficient curb and gutter discovered during the one-year warranty period and listed on Plaintiff's Exhibit HHH–1, Drake-Henne is responsible for the removal and replacement of 2010 lineal feet thereof at $4.50 per lineal foot.

Drake-Henne is also liable for any incidental expenses which are incurred in the course of removing and replacing this curb and gutter, but because we cannot anticipate the type and quantity of such work, the total cost for this will also have to be determined by the trial court upon remand, presumably by applying the same per-unit amounts which were used to calculate the original award.

Notwithstanding that the City has argued the issues heretofore considered in this opinion, it asserts on cross-appeal that the trial court erred in failing to find that the City was entitled to fixed and liquidated damages in the amount of $628,999.64, as set by the terms of the performance bond. The pertinent parts of the bond read:

"WHEREAS, said Principal has entered into a certain contract with the CITY OF WAHPETON, NORTH DAKOTA * * * which contract is by this reference made a part hereof as fully with the same force and effect as if set forth verbatim herein.

\* \* \* \* \* \* \*"

"Provided, that in the event of default on the part of the Principal to perform the work as provided in said Contract, the sum named in this bond shall be taken as fixed and liquidated damages in favor of said CITY OF WAHPETON, NORTH DAKOTA and the full amount thereof may be recovered from the principal and surety in an action by the (city) of WAHPETON, NORTH DAKOTA on this Bond."

The City asserts that Section 40–22–31, N.D.C.C., which follows:

"40–22–31. Conditions of contractor's bond.—The contractor's bond shall be made payable to the municipality and shall be conditioned:

"1. That he well and faithfully will perform the work bid for in accordance with the terms of and within the time provided for in the contract, and pursuant to the plans and specifications for such work on file in the office of the city auditor;

"2. That he will pay for all labor and material used in such work; and

"3. That in case of a default on the part of the bidder or contractor in the performance of the work as provided in his contract, the sum named in the bond shall be taken and held to be fixed and liquidated damages in favor of the municipality, and that the full amount thereof may be recovered from said bidder and his sureties in an action by the municipality against them on said bonds." N. D.C.C.

It is our view that this statute and the terms of this bond must also be considered in light of Sections 9–08–03 and 9–08–04, N.D.C.C., which follow:

"9–08–03. Penalties and penal clauses void.—Penalties imposed by contract for any nonperformance thereof are void."

"9–08–04. Fixing damages for breach void—Exception.—Every contract by which the amount of damages to be paid, or other compensation to be made, for a breach of an obligation is determined in anticipation thereof is to that extent void, except that the parties may agree therein upon an amount presumed to be the damages sustained by a breach in cases where it would be impracticable or extremely difficult to fix the actual damage." N.D.C.C.

The City asserts that the terms of the bond were required under Section 40–22–31, N.D.C.C., and that therefore the parties' intentions are immaterial and that the only construction that can be given the statute and the bond in light of the statute is that in the event of any default, complete or not, the City becomes entitled to the full amount of the bond irrespective of the amount of actual damages.

In support of this contention, the City refers us to the case of City of Lake Geneva v. States Improvement Co., 45 Wis.2d 50, 172 N.W.2d 176 (1969).

In *Lake Geneva,* the City of Lake Geneva advertised that it would accept bids for the construction of a sewer on the east shore of Lake Geneva. The defendant contractor submitted a bid for the construction of the sewer, together with a bid bond. The City accepted the bid and so informed the contractor, but the contractor failed to execute the contract and performance bond. The issue in the case is whether the bid bond obligated the contractor and the insurance company to pay to the City five per cent of the bid or whether it obligated them to pay the actual damages only, not to exceed five per cent of the bid. The pertinent part of the Wisconsin statute reads:

> "No bid shall be received unless accompanied by a certified check or a bid bond equal to at least 5 per cent but not more than 10 per cent of the bid payable to the city as a guaranty that if his bid is accepted he will execute and file the proper contract and bond within the time limited by the city. * * * In case he fails to file such contract and bond the amount of the check or bid bond shall be forfeited to the city as liquidated damages. The notice published shall inform bidders of this requirement." Sec. 62.-15(3), Wisconsin Statutes.

The Wisconsin supreme court, in setting forth what it believed to be the pertinent parts of the specifications and the bid bond, italicized the words deemed controlling, as follows:

> "No bid can be received or considered unless accompanied by a certified check *equal to 5 per cent of the bid,* or a bid bond in equal amount payable to the City as a guaranty that if the bid is accepted, the Bidder will execute and file the proper Contract and Bond within ten days from the date the lowest responsible Bidder's bid is accepted. In case the Bidder fails to file such Bond and Contract within the time set by the City, *the check or bid bond shall be forfeited to the City as liquidated damages."*

"*The Bid Bond.*

"The bid bond of the insurance company, which accompanied the bid of the contract on the storm sewer project, provided:

> "*Know all Men by these presents:* That We, *States Improvement Company* * * * as Principal, and the *United Pacific Insurance Company* * * * as Surety, are held and firmly bound unto the *City of Lake Geneva, Wisconsin* as obligee, *in the sum of Five Per Cent (5%) of the Amount of the Attached Bid* * * *"* [Emphasis supplied.]

City of Lake Geneva v. States Improvement Co., *supra,* 172 N.W.2d 176, 178, 179.

In concluding that the contractor was obligated to pay the City five per cent of the bid, the court said:

> "The defendants attack the trial court judgment (and without saying so the statute involved as well) on the ground that the provision for liquidated damages actually is a penalty. Wisconsin long has recognized the distinction between liquidated damages and a penalty, holding that 'Whether or not a contractual provision calls for a penalty or liquidated damages is a question of law for the court. * * *' McConnell v. L. C. L. Transit Co. (1969), 42 Wis.2d 429, 438, 167 N.W.2d 226, 230. However, here we deal with something more than ascertaining the actual intent of the parties to the agreement. The stipulated liquidated damages are provided for in the applicable statute. In fact they are required by such statute." City of Lake Geneva v. States Improvement Co., *supra,* 172 N.W.2d 176, 179, 180.

This is the only case referred to us by the City in support of its contention that it is entitled to recover as liquidated damages the face amount of the performance bond.

It is our view that the instant case may be distinguished from *Lake Geneva* on both the facts and the law. As for the facts, in the instant case, the contractor performed to the extent that the engineer accepted the project and the contractor was paid in full for the project, whereas in *Lake Geneva* the contractor performed no part of the contract. As for the law, in *Lake Geneva* the statute states that in case the contractor fails to execute and file the proper contract and bond, the amount of the check or bid bond *shall be forfeited* to the City as liquidated damages and the specifications also use the same words; whereas in the instant case, Subsection 3 of Section 40–22–31, N.D.C.C., merely provides that in event of default in the performance of the work, the full amount of the sum named in the bond *may be recovered* and the bond uses the same words.

The contractor refers us to encyclopedia law to the effect that a sum named in a bond is not recoverable in a case of a partial breach where the measure of damages for partial breach is ascertainable.

"A sum named is not recoverable in a case of a partial breach where the measure of damages for partial breach is ascertainable, for under such circumstances the sum named is generally regarded as a penalty and recovery will be limited to the damages actually sustained." 22 Am.Jur.2d, Damages, § 232, pages 318–319.

The decisions alleged to support that statement from American Jurisprudence 2d are: Mt. Airy Mill. & Grain Co. v. Runkles, 118 Md. 371, 84 A. 533 (1912); Wilkes v. Bierne, 68 W.Va. 82, 69 S.E. 366 (1910); Condon v. Kemper, 47 Kan. 126, 27 P. 829 (1891). These decisions are of little help as none involve a performance bond the provisions of which are estab-lished by statute, as is the situation in this case.

■ We, however,, conclude in light of the need to harmonize Section 40–22–31, Subsection 3, with Sections 9–08–03 and 9–08–04, N.D.C.C., that the default referred to in Section 40–22–31, Subsection 3, must amount to a complete failure of performance before the entire amount of the bond may be taken as a fixed and liquidated damage.

This is consistent with our approach to a similar problem of apparently conflicting statutes in Keller v. Paris, 207 N.W.2d 239 (N.D.1973), where we quoted Syllabus ¶ 1 of Stradinger v. Hatzenbuhler, 137 N. W.2d 212 (N.D.1965), as follows:

"When two statutes relating to the same subject matter appear to be in conflict, they should be construed whenever possible to give effect to both statutes if this can be done without doing violence to either."

See also Kosmatka v. Safety Responsibility Division, Etc., 196 N.W.2d 402 (N.D. 1972), and In Re Weisser Finance Company, 169 N.W.2d 420 (N.D.1969).

Sections 9–08–03 and 9–08–04, N.D.C.C., are similar to Sections 53–9–4 and 53–9–5 of South Dakota Compiled Laws 1967 Annotated, which we construed in Hofer v. W. M. Scott Livestock Company, 201 N. W.2d 410 (N.D.1972). Our construction of the pertinent statutes in this case is in accord with our construction of the South Dakota statutes.

Having previously concluded herein that the City is entitled to recover $9,045 for the removal and replacement of 2010 lineal feet of deficient curb and gutter and $2,250 for correcting deficiencies described in items 1, 2, 4, and 6 of Plaintiff's Exhibit HHH, making a total of $11,295, plus interest at 4% per annum from August 5, 1964, and that the case must be remanded for further hearings relative to the determination of the cost of correcting deficien-

cies described in items 3, 5, 7, and 8 of Plaintiff's Exhibit HHH, incidental expenses which may be incurred during the removal and replacement of the 2010 lineal feet of deficient curb and gutter, and interest at 4% per annum from August 5, 1964, we hereby reverse the judgment of the district court and remand the case to the district court for further proceedings consistent with this opinion.

PAULSON and KNUDSON, JJ., concur.

VOGEL, J., not being a member of the Court at the time of submission of this case, did not participate in the decision.