630 N.W.2d 38 (2001)
2001 ND 127
In the Interest of T.K., a Minor Child.
Lonnie Olson, Ramsey County State's Attorney, Petitioner and Appellee,
v.
T.K., and his parents, M.F. and M.K., and his guardian ad litem, Sharon Hendrickson, Respondents,
M.F., Respondent and Appellant.
In the Interest of D.F., a/k/a D.K., a Minor Child.
Marlys K. Joramo, LSW, Petitioner and Appellee,
v.
D.F., a/k/a/ D.K., and his guardian ad litem, Sharon Hendrickson, and his parents, M.F. and M.K., Respondents,
M.F., Respondent and Appellant.
Nos. 20000328, 20000329.
Supreme Court of North Dakota.
July 10, 2001.
*40 Lonnie Olson, State's Attorney, Devils Lake, for petitioners and appellees; submitted on brief.
Coral Joan Mahler, Sheyenne, for respondent and appellant; submitted on brief.
MARING, Justice.
[¶ 1] M.F. ("Mary")[1] appealed from orders terminating her parental rights to her children, T.K. ("Tim") and D.F. ("David"). We hold there is clear and convincing evidence the children are deprived, the causes and conditions of the deprivation are likely to continue, and, as a result of the continued deprivation, the children will probably suffer serious physical, mental, or emotional harm if Mary's parental rights are not terminated. We affirm.

I
[¶ 2] On appeal, Mary asserts the State has failed to prove the three elements for parental termination by clear and convincing evidence and the trial court, therefore, erred in terminating her parental rights. Under N.D.C.C. § 27-20-44(1)(b)(1) a juvenile court may terminate parental rights providing: (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue; and (3) the child is suffering, or will in the future, probably suffer serious physical, mental, moral, or emotional harm. The party seeking parental termination must prove all elements by clear and convincing evidence. In re D.N., 2001 ND 71, ¶ 2, 624 N.W.2d 686. On appeal, we review the juvenile court's decision and examine the evidence in a manner similar to a trial de novo. Id. We review the files, records, and transcript of the evidence in the juvenile court, giving appreciable weight to the findings of the juvenile court. Id. Although we are not bound by the juvenile court's findings, we give them appreciable weight and give deference to the juvenile court's decision, because that court had an opportunity to observe the candor and demeanor of the witnesses. In re M.S., 2001 ND 68, ¶ 5, 624 N.W.2d 678.

II
[¶ 3] Mary, now age 24, gave birth to Tim on October 13, 1997. Tim's natural *41 father M.K. ("Mike"),[2] now age 33, has had an on-going relationship with Mary, but the two are not married. Mary and Mike have had a very violent, chaotic relationship in which each has often physically abused the other, resulting in each receiving cuts, bruises, and other injuries, sometimes requiring emergency medical attention.
[¶ 4] When Tim was ten months old he sustained a fractured skull when Mary fell while holding him. Mary took Tim for emergency treatment. The doctor examined Tim and determined Tim's development was substantially delayed. He diagnosed Tim as suffering from a failure to thrive, generally indicating the child lacked stimulation from caregivers, and, because the child had not been held enough or nurtured sufficiently, his development was many months behind a normally developing child. Subsequent examinations have revealed that Tim suffers from a brain abnormality, with possible retardation, and he is a special needs child.
[¶ 5] In August 1998, the juvenile court determined Tim was a deprived child, based upon evidence of Tim's developmental delay and on evidence showing the parents' on-going domestic violence and abuse created an atmosphere placing Tim at risk of harm. For example, there was evidence Mary, while angry at Mike, attempted to ram him with the baby stroller while Tim was sitting in it. There was also evidence that Mike fed Tim a small amount of alcohol and blew marijuana smoke in Tim's face to see how the infant would react. Legal custody was placed with Ramsey County Social Services. Mary was allowed to have physical custody of Tim, but she was ordered to undergo a psychological evaluation. Mary and Mike were also ordered to cooperate with the assistance programs offered by social services personnel to improve Mary and Mike's parenting skills and to provide Tim with a more stable and secure living environment.
[¶ 6] The juvenile court placed Tim in foster care on October 13, 1998, and the judicial referee made the following relevant findings on November 4, 1998:
After the August hearing the Early Headstart and Parent Aide programs were put into place. Attempts were also made to have [Mary] become involved with services at the Human Service Center to deal with her anger control. At this point none of these programs have really gotten underway, as [Mary] does not see any need to change her behaviors and although she has attended, she has not really participated in the Parent Aide program or in the Early Headstart program. Regardless of what [Mary's] intent is in regards to these programs, the fact is that over the past three months no progress has been made.
....
[I]n this case the child has special needs which the child's mother is not able to meet at this time given the nature of the needs and the age of the child, time is of the essence. The risk of irreparable damage to the child if his needs are not addressed in a timely manner, is such that to return him to his home, without reasonable expectations that [Mary] will be willing and/or able to take the steps necessary to address her child's developmental delays, would be irresponsible. Even if [Mary] fully intends to cooperate in these efforts, the evaluation report indicates that until she addresses her own issues, she does not have the ability to do so.
*42 [¶ 7] Mary and Mike's tumultuous and abusive relationship continued. Several protection orders were sought and entered against each of the parties to stay away from the other and those were often violated. In January 1999, Mary was sentenced to prison for six months for violating a protection order. Tim's custody with Ramsey County Social Services was extended, and he remained in foster care. In the meantime, Mike was incarcerated on a burglary conviction. In addition to that conviction, Mike has convictions for forgery and theft. The evidence also shows that Mike has struggled with alcohol and drug addictions and has relapsed on several occasions after receiving treatment.
[¶ 8] In July 1999, the juvenile court again extended Tim's custody with Ramsey County Social Services, making the following relevant findings:
[Mary] was required to work with Ramsey County Social Services in an effort to help her develop the skills necessary to meet the child's special needs. Around the first of the year [Mary] was incarcerated at James River. She was released on June 26, 1999. As a result the reunification plan was not implemented and the deprivation issues remain unresolved.
....
Reasonable efforts have been made to prevent or eliminate the need to remove [Tim] from his home, but these efforts have as of yet been unsuccessful. To return or continue the child in his home at this time would be contrary to the child's welfare.
[¶ 9] Despite Mary and Mike's violent and abusive relationship, Mary again became pregnant with his child.[3] In January 2000, Tim's custody with Ramsey County Social Services was again extended for six months, and the judicial referee made the following relevant findings:
[Mary] has continued in a counseling program at the Human Service Center where progress has been "sporadic". There has been progress with parenting and nurturing skills, but there continues to be a concern regarding her judgment and impulsive behaviors, particularly in regards to the child's father, [Mike].
....
Based upon their experience with [Mary] and the report from her psychological evaluation, the concerns of Social Services and [Mary's] counselor are that when it comes to [Mary's] relationship with [Mike], that becomes the primary focus of [Mary] and the needs of her child come second. Given the special needs of the child and [Mike's] failure to address his domestic violence and chemical usage problems, it is especially necessary that [Mary] be committed to putting the child's needs above her relationship problems with [Mike].
[Mary] maintains that she has discontinued her relationship with [Mike], yet she acknowledges that she is pregnant with his child and visits with him twice weekly, when possible, at the jail where he is incarcerated. Her statements are not consistent with her actions.
....
Reasonable efforts have been made to prevent or eliminate the need to remove [Tim] from his home, but these efforts have as of yet been unsuccessful. To return or continue the child in his home at this time would be contrary to the child's welfare.
*43 [¶ 10] Mary gave birth to David on March 18, 2000. David was removed from Mary's home on June 1, 2000 after Mike reported Mary had "plopped" the child roughly onto the couch and had on several occasions threatened to throw the baby against the wall. By order of the court on September 8, 2000, David was adjudicated a deprived child and was placed in the custody of Ramsey County Social Services for placement in foster care.
[¶ 11] In October 2000, petitions were filed to terminate both Mary and Mike's parental rights to Tim and David. After a trial on the merits, the court granted the petitions terminating Mary and Mike's parental rights to these children, making the following relevant findings and conclusions:
[Tim] was adjudicated a deprived child on August 12, 1998.
....
[David] was adjudicated a deprived child on August 9, 2000. The deprivation was based on the continuing domestic violence between [Mary] and [Mike]. An aspect of the domestic violence between the parties in this action was that on occasion [Mary] would threaten to harm the child. The domestic violence between the parties has included physical violence against each other.
....
[Mike and Mary] are unable to care for their children at this time. The counseling services provided to [Mike and Mary] have not altered their behavior. The conditions or causes of deprivation are likely to continue. Substantive changes in the behavior of [Mike and Mary] in the near future are unlikely.
....
[Tim and David] continue[ ] to be ... deprived child[ren].
The conditions and causes of deprivation as set forth in this case are likely to continue and not be remedied in the future.
[Tim and David have] need for a stable, safe and permanent home environment which can not be provided by the parents. As a result, [Tim and David] continue[ ] to suffer serious mental, physical, moral and emotional harm from not being in a permanent home.

III
[¶ 12] Mary asserts there is not clear and convincing evidence that Tim and David are deprived children. A deprived child is one who "[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child's physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child's parents, guardian, or other custodian." N.D.C.C. § 27-20-02(8)(a). Parents' fundamental and natural rights to their children are of constitutional dimension, but they are not absolute, and parents must at least provide care to their children that satisfies the minimum community standards. In re D.N., 2001 ND 71, ¶ 12, 624 N.W.2d 686.
[¶ 13] This record clearly supports a finding that Tim and David are deprived children. As Rhonda Riggin, a Ramsey County Social Services abuse and neglect assessment worker, testified in November 1998, Mary and Mike provide a "violent, chaotic home situation." The domestic violence perpetrated by these two adults against each other creates an environment of high risk for harm to these two children. Tim was removed from the home in 1998, because he suffered from severe developmental delay resulting in a diagnosis of failure to thrive, indicating a *44 probable lack of caregiver attention, and because he had been placed in the middle of Mary and Mike's violent and abusive fighting. David, at age three months, was removed from the home after Mike reported Mary handled the infant roughly and had threatened to throw the baby against the wall on several occasions when she was angry and upset. At various times, both of these parents have expressed a belief the other parent is not capable of providing stable, continuous, safe and secure care for these boys. The incidents of Mary angrily ramming the stroller at Mike with Tim sitting in it and of Mike giving alcohol and blowing marijuana smoke in the infant's face are clear examples of the serious risk these children would face in Mary's home and the failure of these adult parents to meet minimum standards for providing a safe and loving environment for these children.

IV
[¶ 14] Mary asserts there is not clear and convincing evidence the deprivation is likely to continue. In determining whether the causes and conditions of deprivation will continue or will not be remedied, evidence of past deprivation alone is not enough, and there must be prognostic evidence that forms the basis for reasonable prediction of continued or future deprivation. In re Z.R., 1999 ND 214, ¶ 18, 602 N.W.2d 723. A lack of parental cooperation is pertinent in determining whether deprivation will continue. Id.
[¶ 15] Numerous assistance programs have been provided for Mary to improve her parenting skills. Although at times she has cooperated, the evidence shows the cooperation is sporadic and Mary often places her own needs and her desire to continue a relationship with Mike as priorities over her goals of providing a safe environment for the children and of improving her parenting abilities. Tim has been in foster care for over two years. When there has been an extensive period in which efforts have been made to overcome a parent's inability to effectively parent, the court cannot allow the children "to remain in this indeterminate status midway between foster care and the obvious need for permanent placement." In re A.M., 1999 ND 195, ¶ 9, 601 N.W.2d 253. Assisting a parent to establish an adequate environment for the children by offering long-term and intensive treatment is not mandated if it cannot be successfully undertaken in a time frame that would enable the children to return to the parental home without causing severe dislocation from emotional attachments formed during long-term foster care. In Interest of A.S., 1998 ND 181, ¶ 33, 584 N.W.2d 853.
[¶ 16] Dr. Faramarz Simhai, a clinical and counseling psychologist at the Lake Region Human Service Center, conducted two psychological evaluations of Mary. In his July 12, 2000 report, he speaks of the likelihood of Mary being unable to effectively parent these children in the future:
It may be asked, what are the chances that with additional therapy (or perhaps different therapists) she may muster up what it takes to rise to the occasion and become a better mother to the point that she can parent one or both of her children effectively. This examiner sees the chances for [Mary] making the quantum leap forward that would generate the necessary changes in her parenting style as limited. Quite limited indeed. However, to stay humane and prudent, and more importantly, because [Mary] cares about her children, has bonded to them, and if functioning at the upper limits of her motivation and intelligence, she just might pull off the necessary changes, *45 this examiner would plead for giving her several more months before a final decision is made about her parental rights. [I]f Mary has not made clear and definite headway in remedying the factors that led to the removal of her children in 4-6 months, giving her more time will not likely change the picture greatly. (Emphasis in original.)
Although Mary had been offered considerable months of assistance and opportunity to improve her home environment and her ability to parent these children, Dr. Simhai urged she be given some additional months of time to meet those objectives. More months of time with offered assistance were given to Mary, but the results were not favorable. Marlys Joramo, a foster care worker, testified at the parental termination hearing that there were several violent episodes between Mary and Mike in September and October, 2000. Roxanne Dahly, a counselor and social worker, also testified that the fighting between these parents continues with no change in behavior by Mary, and that instead of improvement there has been an escalating cycle of domestic violence. Sharon Hendrickson, the court-appointed guardian ad litem for the children, also testified that she remained fearful the children would not be safe in Mary's home. Dr. Simhai said in his report that if Mary "has not made clear and definite headway" to improve her parenting skills and her environment during a four to six month extension of assistance, then "giving her more time will not likely change the picture greatly." We conclude there is clear and convincing evidence the conditions and causes of the deprivation of these children are likely to continue.

V
[¶ 17] Mary asserts there is not clear and convincing evidence these children are or will in the future probably suffer serious physical, mental, moral, or emotional harm as a result of the deprivation. To terminate parental rights, a court need not await the happening of a tragic event. McBeth v. J.J.H., 343 N.W.2d 355, 360 (N.D.1984). Mary has been either unwilling or unable to control her emotions and her anger sufficiently to provide a safe and secure environment for these children. Mary's children will probably suffer serious physical, mental, or emotional harm if placed in her current home environment of physical violence and abuse. While Mary was supposed to be improving her parenting abilities and attempting to regain physical custody of her children, she continued her tumultuous relationship with Mike and violated a court protection order resulting in her being incarcerated for several months. The potential harm to these children, both mental and physical, in the environment Mary can now offer them is evident. When the mental and physical health of a child are the concerns, it is not enough that a mother indicates a desire to improve. McBeth v. M.D.K., 447 N.W.2d 318, 322 (N.D.1989). Mary has been given considerable time and numerous chances to change her priorities, to improve her parenting abilities, and to ensure a safe home for these children. She has failed to take advantage of the opportunities to change or the assistance offered her. We conclude there is clear and convincing evidence these children, as a result of their deprivation, are suffering and in the future will probably suffer serious physical, mental, or emotional harm.
[¶ 18] The orders terminating Mary's parental rights are affirmed.
[¶ 19] GERALD W. VANDE WALLE, C.J., and WILLIAM A. NEUMANN, DALE V. SANDSTROM, and CAROL RONNING KAPSNER, JJ.
NOTES
[1] All names of the parties, other than the State, are pseudonyms.
[2] The juvenile court also terminated Mike's parental rights to Tim and David, but Mike has not appealed from the court's order and is not a party to this appeal.
[3] Although there is some evidence Mary was involved with another man during this time, the parties assume this is Mike's child and paternity is not an issue in the case.