Filed 6/30/04 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2004 ND 126

In the Interest of T.F. and T.F., Children

Stuart A. Larson, Petitioner and Appellee

v.

Director, Traill County 

Social Services, J.F., N.K., 

T.F., T.F., and Jared Simonson, 

Guardian ad Litem, Respondents

J.F., Respondent and Appellant

No. 20030236

Appeal from the Juvenile Court of Traill County, East Central Judicial District, the Honorable Janice Benson Johnson, Referee.

AFFIRMED.

Opinion of the Court by Maring, Justice.

Stuart A. Larson, State’s Attorney, P.O. Box 847, Hillsboro, N.D. 58045-0847, for petitioner and appellee.

Douglas W. Nesheim (argued) and Steven D. Mottinger, 15 9th Street South, Fargo, N.D. 58103-1830, for respondent and appellant.

Interest of T.F.

No. 20030236

Maring, Justice.

[¶1] J.F. (“John”)
(footnote: 1) appealed from an order of the juvenile court terminating his parental rights to his six-year-old son, T.C.F. (“Ted”), and his four-year-old daughter, T.M.F. (“Tina”).  We hold there is clear and convincing evidence warranting termination of John’s parental rights and there is evidence beyond a reasonable doubt that John’s continued custody of the children is likely to result in serious emotional or physical harm to them, and we affirm.

I

[¶2] In January 2001, Ted and Tina were taken into protective custody by Traill County Social Services as a result of allegations that John had been physically abusive toward Ted.  Since that time, the children’s mother has had no personal contact with the children and has written each of them only one letter.  Her parental rights were also terminated, but she has not appealed from that decision. 

[¶3] In May 2001, John pled guilty to aggravated assault as a result of charges that he had sex with his live-in girlfriend’s ten-year-old daughter while the girlfriend was working out of the home.  John claims that these charges were fabricated and that he pled guilty to aggravated assault so he would not have to be involved with the girlfriend again.  

[¶4] Traill County Social Services reunited the children with John, placing them in his physical custody on February 26, 2002.  The agency provided assistance to John and implemented various programs to improve John’s parenting skills and to have him deal with anger management and other related issues.  The program required that John obtain steady employment and that he refrain from using alcohol or illegal drugs.  John did not fully comply with the program requirements.  After the children were reunited with him, he continued to smoke marijuana and was charged with driving under the influence of intoxicating beverages.  John testified that he did not seek treatment for drug or alcohol abuse because “I think I went through treatment when I was 18 years old. . . .  I haven’t had drug or alcohol problems, I guess, that stopped me from being a parent.”  In spite of this testimony, John’s probation was revoked because of his use of drugs and alcohol.  He was reincarcerated, resulting in the children again being removed from his custody on July 9, 2002.  John is currently serving a seven-year-sentence with a parole release date of June 6, 2007.  After this latest separation, the children were placed by social services in the home of an aunt.  The current agency plan is for these children to be adopted by the aunt, upon termination of their mother and father’s parental rights.

[¶5] A petition was filed to terminate parental rights, and a hearing was held on March 26, 2003, and continued to June 9, 2003.  After the hearing, a judicial referee granted the petition, finding the children were deprived, the deprivation would likely continue, and that, unless parental rights were terminated, the children would suffer serious physical, mental, moral, or emotional harm. 

II

[¶6] On appeal, John asserts that the court erred in finding there was clear and convincing evidence the children are deprived and that such deprivation is likely to continue.  He also asserts there is insufficient evidence to support a finding that there is no reasonable doubt the children will likely suffer serious harm unless parental rights are terminated. 

[¶7] The juvenile court may terminate parental rights providing: (1) the child is a deprived child; (2) the conditions and causes of the deprivation are likely to continue; and (3) the child is suffering, or will in the future probably suffer serious physical, mental, moral or emotional harm.  N.D.C.C. § 27-20-44(1)(b).  A party seeking termination of parental rights must prove all elements by clear and convincing evidence.  
In re D.Q.
, 2002 ND 188, ¶ 19, 653 N.W.2d 713.  In addition to our state law requirements for parental termination, the requirements of the Indian Child Welfare Act, 25 U.S.C. § 1912 must be met, because these children are members of an Indian tribe.  
In re M.S.
, 2001 ND 68, ¶ 4, 624 N.W.2d 678.  Relevant to this case, 25 U.S.C. § 1912(f) provides:

No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

Also relevant, 25 U.S.C. § 1912(d), provides:

Any party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

These state and federal provisions create a dual burden of proof on the party seeking termination of parental rights to an Indian child, whereby the elements of our state law must be proven by clear and convincing evidence and the federal requirement, that the continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child, must be satisfied with proof beyond a reasonable doubt.  
In re M.S.
, 2001 ND 68, ¶ 4, 624 N.W.2d 678.  

[¶8] Rule 52(a), N.D.R.Civ.P., was amended, effective March 1, 2004, to provide that findings of fact in juvenile matters shall not be set aside by this Court unless they are clearly erroneous.  It is solely within the discretion of the Supreme Court to determine the effective date of a rule of procedure not affecting substantive rights.  
Paxton v. Wiebe
, 1998 ND 169, ¶ 22, 584 N.W.2d 72.  This Court has followed the practice that as existing rules of procedure are amended or new rules are added they will apply to actions then pending unless their application would not be feasible or would work an injustice.  
Id.
  

[¶9] In this case, John elected not to request a review by the district court believing that this Court would conduct a de novo review of the referee’s decision.  When a party requests a review of the referee’s findings and order by the district court, it is a review on the record “unless the court orders a hearing of the proceeding.”  N.D. Sup. Ct. Admin. R. 13.  Only when the district court’s review is on the record, must it accept the referee’s findings unless they are clearly erroneous.  
See
 
In re A.B.
, 2003 ND 98, ¶ 4, 663 N.W.2d 625.  Consequently, in foregoing a district court review, John waived the potential right to have an evidentiary hearing and de novo decision by the district court.  Under this circumstance, we conclude fairness and justice warrant that we apply the standard of review under N.D.R.Civ.P. 52(a) in effect prior to the March 1, 2004 amendment, which is similar to a trial de novo.  
In re D.R.
, 2001 ND 183, ¶ 2, 636 N.W.2d 412.  Under the trial de novo standard we review the files, records, and transcript of the evidence in the juvenile court, and, although we are not bound by the findings of the juvenile court, we give those findings appreciable weight and give deference to the juvenile court’s decision, because that court had an opportunity to observe the candor and demeanor of the witnesses.  
Id.
 

A.  Deprivation

[¶10] A deprived child is statutorily defined under N.D.C.C. § 27-20-02(8)(a) as one who “[i]s without proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child’s physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child’s parents, guardian, or other custodian.”  The juvenile court found these were deprived children, because they are without proper parental control in that the mother has had no personal contact with the children since their first placement in foster care in January 2001, and their father is incarcerated and unable to care for them.  The court also found the children had been placed in foster care for 450 of the previous 660 nights. 

[¶11] At the time of the termination proceedings, neither parent was available to provide the necessary care or control of these children.  The children’s mother has voluntarily removed herself as a significant factor in the children’s lives.  John voluntarily violated  conditions of his probation and, as result, is incarcerated and not able to provide for the children’s care for a considerable time.  He is not scheduled for possible release until June 2007.  The definition of a deprived child is broad enough to encompass a child whose parent is shown to be presently incapable of providing proper parental care for the child.  
In re C.R.
, 1999 ND 221, ¶ 6, 602 N.W.2d 520.  The definition of a deprived child also encompasses a child who has been in foster care or in the care, custody or control of social services for “at least four hundred fifty out of the previous six hundred sixty nights.”  N.D.C.C. § 27-20-

44(1)(b)(2).  Having reviewed the record, we conclude there is clear and convincing evidence these are deprived children.  

B.  Continued Deprivation

[¶12] John asserts there is not clear and convincing evidence that the deprivation of these children is likely to continue.  Evidence of a parent’s background, including previous incidents of abuse and deprivation, may be considered in determining whether deprivation is likely to continue.  
In re D.R.
, 2001 ND 183, ¶ 11, 636 N.W.2d 412.  While incarceration, by itself, does not establish abandonment of a child for purposes of terminating parental rights, a probability of serious mental and emotional harm to the child may be established by prognostic evidence that a parent’s current inability to properly care for the child will continue long enough to render improbable the successful assimilation of the child into a family if the parent’s rights are not terminated.  
In re C.R.
, 1999 ND 221, ¶ 10, 602 N.W.2d 520.  

[¶13] Dr. Leland Lipp, a practicing psychologist in Grand Forks, testified that the continued absence of Ted’s mother and father will result in serious emotional harm to Ted.  He testified the boy “needs to be in a safe, secure environment for a long period of time.”  He also testified that Ted has had adjustment difficulties caused by his being emotionally harmed in the past.  Dr. Lipp testified that Ted told him he had been “hurt by his father” and he was “afraid of his father.”  Dr. Lipp testified it would be in Ted’s best interest to not have further contact with his father.  

[¶14] Tammy Ness, a social worker with the North Central Human Service Center, testified that Tina has had at least five primary care placement changes in her four-

and-one-half years of life.  She testified that Tina needs to be “taken out of this state of limbo.  She needs to be in a secure, long term, final placement.”  

[¶15] Janice DuBois DeLorme, a social worker with the Turtle Mountain Child Welfare and Family Services Unit in Belcourt, testified that she believes beyond a reasonable doubt the deprivation of these children cannot be avoided or corrected.  She testified that John, upon his reunification with the children, failed to follow through on recommendations of the social service workers.  DeLorme also testified that John’s  conduct is likely to cause serious physical, mental, or emotional harm to the children if their relationship is allowed to continue.  DeLorme gave her opinion that these children need a permanent home and a stable environment, and she said the Indian tribe supports termination of parents rights and placement of these children with their aunt or other relatives.  

[¶16] John has contributed significantly to the instability in the lives of these children.  They were removed from his care in 2001 when he was arrested and taken into custody.  Social service workers reunited John with the children in 2002, and after only a few months, he voluntarily chose to violate his conditions of probation, resulting in him again being incarcerated and not able to care for the children’s needs.  Although the record shows that John has made some attempts to comply with social service programs aimed at improving his parenting abilities and providing a stable home environment for the children, he did not follow all of the rules and, by violating his probation, did not complete the goal of providing a safe, stable, and permanent environment for these children.  

[¶17] John’s past conduct presents a troubling picture.  John has two older children who were placed in foster care and then permanently placed after John relinquished his parental rights to those children.  John pled guilty to aggravated assault after his former girlfriend accused him of multiple incidents of sexual abuse toward her pre-

teen daughter.  John was also previously charged with physically abusing a minor child, and his son, according to the testimony of Dr. Lipp, has indicated that John had hurt him in the past and that he was afraid of John.  John’s conduct demonstrates a serious indifference toward his responsibilities and obligations as a parent.  When a parent, through voluntary actions, makes himself unavailable to care for and parent a child, without reasonable justification, a young child should not be expected to wait or assume the risk involved in waiting for permanency and stability in his or her life.  
In re C.R.
, 1999 ND 221, ¶ 12, 602 N.W.2d 520.  Based upon our review of this record, we conclude there is clear and convincing evidence the deprivation of Ted and Tina is likely to continue and not be remedied.  

C.  Harm to the Children

[¶18] To terminate parental rights the evidence must show by clear and convincing evidence that, as a result of the continued deprivation, the child is suffering, or will in the future probably suffer physical, mental, moral, or emotional harm.  
In Interest of L.F.
, 1998 ND 129, ¶ 27, 580 N.W.2d 573.  Under the Indian Child Welfare Act there is an additional requirement that the evidence show beyond a reasonable doubt the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.  

[¶19] Each of the experts who testified emphasized that these children have not had stability in their lives and that they desperately need both permanency and stability.  That is something that John cannot now or in the near future give them.  Although it is impossible to be certain what might occur in the future, any prediction of the future requires some reflection into the past conduct of the parties.  
In re D.Q.
, 2002 ND 188, ¶ 21, 653 N.W.2d 713.  John’s past conduct leaves considerable doubt about his ability to parent these children if and when he is released in June 2007, or thereafter.  In the past, John has been unable or unwilling to refrain from conduct which results in his being separated from these children and unable to provide for their care.  John has also demonstrated a lack of cooperation with social service agencies, which may be insufficient by itself to establish deprivation, but is pertinent to the question whether deprivation will continue in the future.  
Id.

[¶20] Dr. Leland Lipp testified that the continued absence of Ted’s parents in his life will result in serious emotional harm to Ted.  Janice DuBois DeLorme testified that John’s conduct of inconsistent parenting and repeated absences from the children will likely cause serious physical, mental, or emotional harm to the children.  After reviewing the record, we conclude there is clear and convincing evidence that, as a result of the continued deprivation, it is likely these children are suffering and will in the future suffer serious physical, mental, moral, or emotional harm.  We further conclude there is evidence beyond a reasonable doubt that the continued custody of these children by John is likely to result in serious emotional or physical damage to the children.

D.  Efforts to Preserve Indian Family

[¶21] Under 25 U.S.C. § 1912(d) any party seeking to terminate parental rights to an Indian child must satisfy the court that active efforts have been made, without success, to provide remedial services and rehabilitative programs to prevent the breakup of the Indian family.  John asserts there is not clear and convincing evidence to support a finding that active efforts were made to preserve this Indian family.  We disagree.  

[¶22] The record shows the social service workers provided assistance to this family in an effort to keep John and the children together.  They established a program for him to participate in parenting and anger management classes and they also provided support in helping him obtain housing.  The program required that John demonstrate he could maintain steady employment and housing, that he refrain from inappropriate behavior in his parenting, and that he refrain from abusing alcohol or using illegal drugs.  The record shows that while John attempted to comply with the program in some respects he utterly failed in others.  Especially troublesome is John’s continued use of alcohol and drugs, with the consequence that he is now incarcerated and unavailable to care for his children.  

[¶23] Valerie Ladwig, the director of Traill County Social Services, testified that John has lacked follow through on recommendations for services and on his need to improve his behavior.  Relevant to John’s cooperation and attitude she also testified:

[John] loves his children deeply and certainly has made that known and made the effort where he can from jail to visit with his children, his parenting ability is compromised by what is going on with him in his personal life.  Related to substance abuse, related to an ongoing inability to follow through with recommendations made by the Court for him to get his children back.  And also the fact that while he’s on probation, while he’s been given a chance by the Court in South Dakota for a very aggravated offense related to a minor, he then is unwilling to follow through with their request that he not engage in substance abuse.  And then, as we know, got the DWI and admits to regular daily use of alcohol and also use of marijuana.  

. . . .

The fact that he worked with us in a very abrasive manner made it difficult at time and again, that was due to his disagreement about some decisions we were making that we felt were in the best interests of the children based upon good clinical practices in the field of social work.

So there were many times a contentious relationship between [John] and our department.

We conclude there is clear and convincing evidence that active efforts were made to preserve this Indian family, but John’s attitude and lack of cooperation thwarted those efforts.

III

[¶24] We hold there is clear and convincing evidence that Ted and Tina are deprived children, the conditions and causes of the deprivation are likely to continue and, as a result, the children will likely suffer serious physical, mental, and emotional harm if John’s parental rights are not terminated.  We also hold there is evidence beyond a reasonable doubt that the continued custody of these children by John is likely to result in serious emotional or physical damage to the children.  The order of the juvenile court terminating John’s parental rights is affirmed.  

[¶25] Mary Muehlen Maring

Gerald W. VandeWalle, C.J.

Sandstrom, Justice, concurring specially.

[¶26] Concluding the clearly erroneous standard of review should apply in this case because application of the amended Rule 52(a), N.D.R.Civ.P., would not work an injustice, I nevertheless concur in the result reached by the majority, because the result would be the same under a clearly erroneous standard of review.

[¶27] Effective March 1, 2004, an amended Rule 52(a), N.D.R.Civ.P., changed the standard of review in juvenile matters from “similar to the former trial de novo” to “clearly erroneous.”  Although in some circumstances amended or new procedural rules might not apply to pending actions, I disagree with the majority’s conclusion that the circumstances in this case warrant our applying the standard of review in effect prior to the March 1, 2004, amendment.

[¶28] Our order adopting the rule change ordered it effective March 1, 2004.  As the Court said in 
Craig v. Herzman
, 81 N.W. 288, 288 (N.D. 1899), Syllabus by the Court:

2.  Such provision, as it relates to procedure only, may be applied in any case tried after its enactment, although the cause of action arose before the enactment.  The rule requiring statutes to be given prospective operation only does not apply to statutes relating to procedure.

In 
In re Foster’s Estate
, 89 N.W.2d 112, 116 (N.D. 1958), this Court said:

When an amendment to a procedural law becomes effective during the pendency of a suit the validity of proceedings had is determined under the old provisions but future procedure is governed by the amendment unless a contrary legislative intent appears.  
M & M Working Company v. Chambers
, Or., 317 P.2d 920; 
Marks v. Crow
, 14 Or. 382, 13 P. 55.

“Pending cases are only affected by general words as to future proceedings from the point reached when the new law becomes operative.”  
Sutherland Statutory Construction
, 3rd Ed., Sec. 2212.

[¶29] When North Dakota adopted the federal rules of civil procedure in 1957, it did not adopt the clearly erroneous standard articulated in those rules.  It was not until 1971 that the trial de novo was repealed and North Dakota amended N.D.R.Civ.P. 52(a) to provide for the clearly erroneous standard for reviewing a trial court’s findings of fact.  At the time of the amendment, N.D.R.Civ.P. 86(a) was in effect, which provides:

[The rules of civil procedure] will take effect on July 1, 1957.  They govern all proceedings and actions brought after they take effect, and also 
all further proceedings in actions then pending
, except to the extent that in the opinion of the court their application in a particular action pending when the rules take effect 
would not be feasible
, or 
would work injustice
, in which event the procedure existing at the time the action was brought applies.

N.D.R.Civ.P. 86(a) (emphasis added).  This Court did not discuss Rule 86(a), however, when determining whether to apply the amended Rule 52(a), N.D.R.Civ.P., to pending proceedings.

[¶30] When appeals were taken after the effective date of the rule, this Court applied the new rule.  
See
 
Gajewski v. Bratcher
, 221 N.W.2d 614, 621 (N.D. 1974); 
Brusegaard v. Schroeder
, 201 N.W.2d 899, 903-04 (N.D. 1972) (not empowered to review matter de novo when repeal was effective prior to time appeal taken).  When judgments in an action were entered after the effective date of the rule, this Court also applied the new rule.  
See
 
McNaught v. MacArthur
, 209 N.W.2d 639, 640 (N.D. 1973).  The new rule has even been applied when the trial began before the rule’s effective date.  
See
 
Trengen v. Mongeon
, 200 N.W.2d 50 (N.D. 1972).  In 
Trengen
, this Court explained that the right to appeal does not attach at the time of trial, but after the judgment is entered.  
Id.
 at 52-53.

[¶31] When the notice of appeal was served and filed before the date of repeal of the trial de novo, this Court held that the appellant was entitled to trial de novo on appeal from the judgment.  
See
 
Automobile Club Ins. Co. v. Hoffert
, 195 N.W.2d 542, 545 (N.D. 1972); 
Northern Plumbing Supply, Inc. v. Gates
, 196 N.W.2d 70, 71 (N.D. 1972); 
East Grand Forks Federal Savings and Loan Association v. Mueller
, 198 N.W.2d 124, 126 (N.D. 1972) (citing 
Hoffert
, 195 N.W.2d at 545).

[¶32] Although these cases seem to suggest a trial de novo should be held if at the time the appeal was filed the appellant was entitled to a trial de novo, none of these cases discuss N.D.R.Civ.P. 86 or its application.  It was not until the decision in 
City of Wahpeton v. Drake-Henne, Inc.
, 215 N.W.2d 897, 902 (N.D. 1973), that this Court recognized that Rule 86(a) permitted the application of amended Rule 52(a) “retroactively.”  In 
City of Wahpeton
 the appeal was taken in December 1968, prior to repeal of the trial de novo.  The Court stated that although Rule 86(a) permitted the application of amended Rule 52(a) “retroactively,” it would not apply it to this case because it had not applied it in the past.  
Id.

[¶33] This Court again interpreted Rule 86 in 
Holloway v. Blue Cross of North Dakota
, 294 N.W.2d 902 (N.D. 1980).  This Court applied a rule of procedure that became effective four days after a class action was filed, finding the rule adequately protected the interests of all the parties.  
Id.
 at 906.  This Court recognized, “This practice should be maintained as the existing rules are amended or new rules are added because it establishes a uniform pattern which civil actions can follow but still permits the court to apply prior rules in pending cases where fairness and justice so warrant.”  
Id.

[¶34] This Court, in 
Paxton v. Wiebe
, 1998 ND 169, ¶ 22, 584 N.W.2d 72, again recognized that Rule 86 applies when determining whether new rules of procedure apply to pending cases.  In 
Paxton
, this Court concluded it would work an injustice to apply new rules of procedure that would make a post-judgment motion untimely when the motion would have been timely under the procedural rules that applied when the motion was filed.  
Id.
 at ¶ 23.
(footnote: 2)  In 
Paxton
, this Court stressed that the amendments to rules should be given “retroactive” application 
to the maximum extent possible
.  
Id.
 at ¶ 22 (emphasis added).  This Court also noted “that an appellate court will apply amended rules in effect at the time the appeal is 
decided
” unless it would work 
a manifest injustice
.  
Id.
 (emphasis added); 
see also
 
Parker v. McGaha
, 321 So.2d 182, 184 (Ala. 1975) (application of the former rules of procedure should be the exception rather than the rule).

[¶35] The 1971 order to amend Rule 52(a) provided:  “the Amendments to the Rules of Civil Procedure so adopted and promulgated shall take effect and be in force 
from and after
 August 1, 1971.”  Supreme Court Order of Adoption of Amendments to the North Dakota Rules of Civil Procedure, June 28, 1971 (emphasis added).  If this was the reason this Court did not apply amended Rule 52(a) “retroactively,” this reason was not articulated in any of the opinions.  The 2004 amendment does not contain similar language.  Legislative history says nothing to indicate how the transition was to occur, nor are there any references in the legislative history to a statute affecting the transition.  There are no Joint Procedure Committee comments about the 1971 amendment, and there was no petition to the Supreme Court to amend Rule 52(a).

[¶36] Although the order to amend Rule 52(a) stated the effective date would be 
from and after
 August 1, 1971, this Court acknowledged in 1973 that it could apply Rule 52(a) “retroactively.”  
See
 
City of Wahpeton v. Drake-Henne, Inc.
, 215 N.W.2d 897, 902 (N.D. 1973).  In 1980, this Court did apply a new rule of procedure “retroactively.”  
Holloway v. Blue Cross of North Dakota
, 294 N.W.2d 902, 906 (N.D. 1980).  In 1998, this Court stressed that new rules must be applied in pending litigation unless to do so would work an injustice.  
Paxton v. Wiebe
, 1998 ND 169, ¶ 22, 584 N.W.2d 72.

[¶37] The notice of appeal in this case was filed on August 11, 2003, prior to the effective date of the new procedural rule requiring a clearly erroneous review of juvenile matters on appeal.  The appellant argues that because his trial date was prior to the effective date of the new rule, the old rule should apply.  He asserts he should get a trial de novo.  He argues that had he known the new rule applied, he probably would have asked for review in the district court and gotten a trial de novo review by a district judge.  It is not at all clear that the appellant would have received a de novo  review by a district judge prior to March 1, 2004.  
See
 
Interest of A.B.
, 2003 ND 98, ¶¶ 5-10, 663 N.W.2d 625.  He argues it is not fair to apply the new rule in this case.  He argues that the rules should apply to decisions made in the lower court after March 1, 2004, but not prior to March 1, because decisions had to be made with clients about whether to request review.  He argues that the rules in effect at the time of the lower court’s decision should apply to that decision.  This Court has recognized that the right to appeal does not attach at the time of trial but rather after the judgment is entered.  
Trengen v. Mongeon
, 200 N.W.2d 50, 52-53 (N.D. 1972).  This Court has also recognized that rules in effect at the time an appeal is decided (not at the time the decision is made in the lower court) should apply unless it would work a 
manifest injustice
.  
See
 
Paxton
, 1998 ND 169, ¶ 22, 584 N.W.2d 72.

[¶38] The appellant also argues that procedural rules that affect due process cannot be retroactively applied.  He argues that at the time the decision was made, he had a right to a de novo review, and that by choosing to appeal with this Court and not asking for review in the district court, he gave up a right to de novo review that he did not know he would lose.  In 
State v. Flohr
, 301 N.W.2d 367, 370 (N.D. 1980), this Court recognized that any rule of procedure can affect substantive rights and thus violate the ex post facto laws and that the court can prevent such retroactive application:

In 
Dobbert v. Florida
, 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977), the Supreme Court declared that “even though it may work to the disadvantage of a defendant, a procedural change is not ex post facto.”  The ban against laws ex post facto “was intended to secure 
substantial personal rights
 against arbitrary and oppressive legislation . . . and not to limit the legislative control of remedies and modes of procedure which do not affect matters of substance.”  [Emphasis added.]  
Dobbert
, 
supra
, 97 S. Ct. at 2298, quoting 
Beazell v. Ohio
, 269 U.S. 167, 171, 46 S. Ct. 68, 69, 70 L. Ed. 216 (1925).

Any rule of procedure can have substantive consequences.  Thus determining whether a procedural change violates the ex post facto clause is necessarily an ad hoc process of line drawing.  
Beazell
, 
supra
, 46 S. Ct. at 69.  Certainly, Rule 12.1 is procedural.  It is found in a compilation entitled “North Dakota Rules of Criminal Procedure.”  Its purpose is to provide an orderly means by which evidence of alibi is adduced at trial.  Further, we do not believe its modification represents an arbitrary and oppressive encroachment upon a defendant’s substantial personal rights.  The exclusionary sanction is not new—it was not created by the amended rule.  The change in the rule’s provision for penalty 
benefits
 defendant by ending the mandatory exclusion of alibi testimony.  That the defendant must now initiate the discovery process is no basis for an ex post facto argument.  Such a change contrasts with those appearing in cases like 
Kring v. Missouri
, 107 U.S. 221, 2 S. Ct. 443, 27 L. Ed. 506 (1883), and 
Thompson v. Utah
, 170 U.S. 343, 18 S. Ct. 620, 42 L. Ed. 1061 (1898), where the prejudicial effects of the new laws were both new and beyond the control of the defendants.  Here, Flohr’s failure to give notice, not the independent working of the rule, was the direct cause of the evidence being barred.  We conclude that the amendment of Rule 12.1 is procedural in the sense that it will not ground a challenge based on the ex post facto clause.

[¶39] Although North Dakota has not yet addressed whether there is a vested right in the type of appellate review received, other courts have addressed this question.  In 
Perez v. Marshall
, 946 F. Supp. 1521, 1530 (S.D. Cal. 1996), the court found that no vested right existed in a statutory scheme that defined the scope of relief and that applying a law that changes the type of review does not divest a person of a vested constitutional right.  The court found that only the standard of review had changed and that the court still reviewed the matter.  
Id.
  It also explained that the change in the standard of review affects only the decision-making process and not the rights of the parties.  
Id.
  In 
Fowler v. State of Texas
, 991 S.W.2d 258, 261 (Tex. Crim. App. 1999), the court found that although the right to appeal constitutes a vested and substantive right, the procedure for review is not a vested and substantive right.  In 
United States v. Daychild
, 357 F.3d 1082, 1106 (9th Cir. 2004), the court found that reliance on a former standard of review when making the decision whether to appeal is not substantive enough to warrant protection under the Due Process Clause.  When new rules effect only a 
remedy
 and not a vested right, they may be applied to pending litigation.  
See
 
Gibson v. Miami Valley Milk Producers, Inc.
, 299 N.E.2d 631, 641 (Ind. Ct. App. 1973).

[¶40] The majority opinion states that under the circumstances in this case, fairness and justice warrant that a de novo standard of review be applied.  The opinion, at ¶ 8, states it would be unjust to apply the amended rule because the appellant “elected not to request a review by the district court[,] believing that this Court would conduct a de novo review of the referee’s decision.”  The opinion does not cite to any cases holding that this type of situation would work an injustice, nor does the opinion explain what factors are considered in determining whether application of a new rule would be unjust.

[¶41] In 
Perez v. Marshall
, 946 F. Supp. 1521, 1530-31 (S.D. Cal. 1996), the court considered three factors in determining whether “retroactive” application of a rule changing the scope of review would result in a manifest injustice:  1) the nature and identity of the parties, 2) the nature of the rights affected, and 3) the nature of the impact of the change of law on those rights.  
Perez
, 946 F. Supp at 1530-31 (citing 
Bradley v. School Bd. of Richmond
, 416 U.S. 696, 94 S. Ct. 2006, 40 L. Ed. 2d 476 (1974)).  In applying the first factor, the court found it favored retrospective application because the case was between individuals and was not of great national concern.  
Id.
 at 1530.  This case is similarly not of great national concern.  In applying the second factor, the court noted that retrospective application is prohibited when it would deprive a person of an unconditional right.  The court found that changing the standard of review does not infringe upon an unconditional right but simply changes the scope of the court’s review.  
Id.
 at 1530-31.  In looking at factor three, the court found that a deferential standard of review did not impose new and unanticipated obligations on the appellant.  
Id.
 at 1531.  The court found no manifest injustice.  
Id.
  Other factors to be considered when assessing whether a manifest injustice would occur if new rules are applied include the substance of the rule involved and the timing of plaintiff’s actions, plaintiff’s obvious gamesmanship or lack thereof, and plaintiff’s reliance or lack of reliance on the rules as they existed at the time he made pertinent decisions in the case.  
Reitmeyer v. Schultz Equipment & Parts Co.
, 2001 WL 633679 *1 (Mich. Ct. App.).

[¶42] In this case, the appellant elected not to request a review by the district court, believing that this Court would conduct a de novo review of the referee’s decision.  The appellant argues that had he known the rule would change, he would have sought review in the district court, hoping for a de novo review.  He is essentially arguing that he was relying upon a de novo review in the appellate court when he decided not to seek review in the district court.  I conclude this is not enough to work an injustice.  
See
 
United States v. Daychild
, 357 F.3d 1082, 1106 (9th Cir. 2004) (reliance on a former standard of review when making the decision whether to appeal is not substantive enough to warrant protection under the Due Process Clause); 
see
 
Gibson v. Miami Valley Milk Producers, Inc.
, 299 N.E.2d 631, 641 (Ind. Ct. App. 1973) (when new rules effect only a 
remedy
 and not a vested right, they may be applied to pending litigation); 
Fowler v. State of Texas
, 991 S.W.2d 258, 261 (Tex. Crim. App. 1999) (the procedure for review is not a vested and substantive right); 
Perez v. Marshall
, 946 F. Supp. 1521, 1530-31 (S.D. Cal. 1996) (no manifest injustice, because changing the standard of review does not infringe upon an unconditional right but simply changes the scope of the court’s review, and because a deferential standard of review does not impose new and unanticipated obligations on the appellant).  Although the appellant filed his appeal and the parties completed their briefing before March 1, 2004, believing that this Court would conduct a de novo review of the referee’s decision, this is not enough to warrant our applying the standard of review under N.D.R.Civ.P. 52(a) in effect prior to the March 1, 2004, amendment.  
See
 
Fowler v. State of Texas
, 991 S.W.2d 258, 262-63 (Tex. Crim. App. 1999).

[¶43] Because amended Rule 52(a), N.D.R.Civ.P., is a procedural rule that does not affect any substantive rights of the appellant, and because application of the rule would not work an injustice, I conclude that a clearly erroneous standard of review should be applied in this case.

[¶44] Dale V. Sandstrom

Carol Ronning Kapsner

Neumann, Justice, concurring specially.

[¶45] I concur in much of the majority opinion.  I would not reach the issue of the standard of review to be applied by us, because under either standard of review I would affirm.

[¶46] William A. Neumann

FOOTNOTES
1:
The names of the parties are pseudonyms.

2:
2
Although this Court in 
Paxton
 found it would work an injustice under the circumstances of that case to apply the new rules of procedure, two justices signed the main opinion, one concurred in the result, and two dissented.