Filed 1/17/08 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2008 ND 9

In the Interest of J.S., a child

In the Interest of J.G., a child

Carrie Smith, L.S.W., Petitioner and Appellee

v.

J.G., Mother, Respondent and Appellant

and 

J.S., a child, J.G., a child, 

D.S., Father of J.S., 

John Doe, Father of J.G., 

and Kathy Kassenborg, 

Lay Guardian ad Litem, Respondents

No. 20070123

Appeal from the Juvenile Court of Cass County, East Central Judicial District, the Honorable Cynthia Rothe-Seeger, Judge.

AFFIRMED.

Opinion of the Court by Crothers, Justice.

Constance L. Cleveland, Assistant State’s Attorney, P.O. Box 3106, Fargo, ND 58108-3106, for petitioner and appellee; submitted on brief.

Douglas W. Nesheim, 15 9th Street South, Fargo, ND 58103-1830, for respondent and appellant; submitted on brief.

Interest of J.S.

No. 20070123

Crothers, Justice.

[¶1] J.G. (“Mother”
(footnote: 1)) appeals the juvenile court’s order terminating parental rights to her two minor children, J.S. (“Sam”) and J.G. (“George”).  We conclude the juvenile court did not err in finding the children have been deprived, the causes and conditions of deprivation are likely to continue, and, as a result of the continued deprivation, Sam and George have suffered or will probably suffer serious physical, mental or emotional harm if Mother’s parental rights are not terminated.  Further, the juvenile court did not err in finding reasonable efforts were made to preserve and unify the family prior to termination of Mother’s rights.  We affirm.

I

[¶2] Mother has three children:  Sally, born September 2001; Sam, born July 2003; and George, born September 2004.  Sally was removed from Mother’s home by Cass County Social Services because Sally was not receiving sufficient care.  Sally is currently placed with her father and is not part of this termination action. 

[¶3] Mother began working with social services voluntarily in August 2003.  At that time, she, Sam, and Sam’s father, D.S., lived together in an apartment.  A parent aide was assigned to assist Mother with Sam, who was one month old.  The aide helped Mother with her parenting skills, focusing primarily on keeping the family’s apartment clean.  In September 2003, D.S. struck Sam and was later convicted of child abuse.  After the incident, Mother and Sam moved into her parents’ home.  D.S. no longer has contact with Sam.  

[¶4] Social services assessed the family’s living situation at the grandparents’ home in December 2003 and found it lacking.  The house was dirty and covered in dog hair from the family’s two German shepherds.  The baby bottles were “dirty and moldy,” and Sam smelled of urine.  Sam was placed in foster care while Mother worked with social services to improve the home environment.  Mother also began seeing a psychiatrist.  On May 6, 2004, Sam was adjudicated a “deprived child” due to poor household conditions, poor hygiene, lack of a regular feeding schedule, Mother’s failure to address her mental health issues and her “demonstrat[ion] of poor judgment with regard to [Sam’s] health and safety.”

[¶5] While Sam was in foster care, George was born.  The identity of George’s father is unknown.  Social services continued working with Mother to improve her parenting skills.  Mother obtained her own apartment within this time frame, though the conditions of the home continued to be a problem.  Nonetheless, Sam was returned to the home from foster care in April 2005.  Mother continued working with social services, and a speech therapist worked with Sam.  Social services monitored Sam until August 2005.  

[¶6] On September 23, 2005, both Sam and George were placed in foster care because of the condition of the apartment.  They were adjudicated deprived children on January 10, 2006.  A treatment plan for the family was developed, including treatment of Mother’s mental illness, parenting classes, homemaking assistance and daycare for the children so Mother could work on improving her life skills.  The children were returned to Mother’s care on January 3, 2006.  Mother took Sam to see a psychiatrist in February 2006 because of his hitting and biting behaviors; he was prescribed mood-stabilizing medication.

[¶7] In June 2006, licensed social worker Carrie Smith received a report of problems at Mother’s home.  Smith and two law enforcement officers went to the home on June 14, 2006 to investigate.  Mother was told in advance that Smith would be visiting the home.  Upon entering the apartment, Smith noticed a strong odor she characterized as “feces and also like a stale smoke, garbage kind of smell.”  Sam and George were found in their bedroom, where several areas of the wall had been smeared with feces.  Sam was eating loose cereal off the floor which was next to feces stains on the carpet.  George was found in his crib, which had only a bare mattress and no bedding.  He was eating loose cereal off the crib mattress.  Both children were dressed only in diapers that appeared not to have been changed that morning.  Sam’s diaper was fastened with duct tape.  No toys, books or play items were available to the children.  All such items were stored in containers out of the children’s reach.  During the visit, Smith witnessed George putting pennies in his mouth.  Other parts of the apartment were in a similar state with cigarette butts and food products on the floor.  One of the officers who accompanied Smith described the home: 

“I didn’t think [the family] should be living there to be blunt.  The place was filthy. . . . It was a mess.  The carpet probably hadn’t been cleaned since they moved in.  There was food all over . . . .  There was garbage piled up all over the residence.  It appeared to be a cleaning solution in a bucket that was on the floor that could be easily accessible to a child. . . . [T]he T.V. that was in the bedroom was on but there was no picture on it.  It was a snowy picture and the children appeared to be watching it as if there was a cartoon on. . . . The house was disgusting.”

During the visit, Mother told Smith she had been “spring cleaning.”  The police officers took photos of the home which were entered into evidence.  Sam and George were taken into protective custody.

[¶8] Sam and George entered foster care on June 14, 2006, and a petition for termination of parental rights was filed on June 30, 2006.  On January 8, 2007, a judicial referee terminated Mother’s parental rights to both Sam and George.  The children’s fathers’ rights were also terminated.  The referee’s findings of fact were (1) Mother has mental health issues and has refused the mental heath services made available to her through social services; (2) Mother complains of numerous physical ailments, including back problems, psoriasis, connective tissue disorder, irritable bowel syndrome, stress and exercise induced asthma, stress induced hives, reflux disorder, ovarian cyst and seizures, but has not sought consistent medical treatment; (3) Mother “fail[s] to maintain the home at or above minimum community standards[,] has failed to appropriately address the hygiene needs of the children and [has] demonstrated poor judgement with regard to the heath and safety of the children”; (4) Mother has been offered extensive services including intervention, referrals and education to help her improve her family’s situation, yet was “unable to maintain any consistent minimal level of care for extended periods of time [which] has resulted in an environment that is unsafe for the children”; and (5) Mother is unable to provide appropriate developmental care for the children, and since entering foster care, the children’s developmental delays have disappeared.  In sum, the referee determined the time needed to create a stable home for Mother’s children is too long and found by clear and convincing evidence the children are deprived and would be harmed without terminating her parental rights.  Sam and George were placed into the custody of the Department of Human Services.

[¶9] In January 2007, Mother requested a review of the referee’s factual findings and order.  On April 5, 2007, the juvenile court adopted the referee’s factual findings and order.  Mother appeals the juvenile court’s order.

II

[¶10] “To terminate a person’s parental rights, the petitioner must prove the child is deprived; the conditions and causes of the deprivation are likely to continue or will not be remedied; and, that by reason thereof the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.”  
In re T.A.
, 2006 ND 210, ¶ 10, 722 N.W.2d 548.  These elements must be proven by clear and convincing evidence.  
Id.
  “Clear and convincing evidence means evidence that leads to a firm belief or conviction the allegations are true.”  
Id.

[¶11] This Court will not overturn a juvenile court’s decision to terminate parental rights unless the decision is clearly erroneous.  
In re E.G.
, 2006 ND 126, ¶ 7, 716 N.W.2d 469.  “A finding of fact is clearly erroneous if it is induced by an erroneous view of the law, if no evidence exists to support the finding, or if, on the entire record, we are left with a definite and firm conviction a mistake has been made.”  
Id.
  

[¶12] Mother appears to concede the children were deprived, but argues insufficient evidence exists to support the finding that deprivation was likely to continue.  She also challenges the finding that the children would likely suffer harm absent a termination of parental rights and argues that reasonable efforts to reunify her family have not been made.  

A

[¶13] A deprived child lacks “proper parental care or control, subsistence, education as required by law, or other care or control necessary for the child’s physical, mental, or emotional health, or morals, and the deprivation is not due primarily to the lack of financial means of the child’s parents, guardian, or other custodian.”  N.D.C.C. § 27-20-02(8)(a).  “Proper parental care is met by exhibiting minimum standards of care that the community will tolerate.”  
T.A.
, 2006 ND 210, ¶ 12, 722 N.W.2d 548.  Mother has not argued in juvenile court or on appeal the referee’s deprivation finding was made in error.  Our review is “limited to issues litigated below and the arguments presented upon appeal.  Where a party fails to provide supporting argument for an issue listed in his brief, he is deemed to have waived that issue.”  
State v. Obrigewitch
, 356 N.W.2d 105, 109 (N.D. 1984).  Based on the record before us, we  affirm the juvenile court’s conclusion that the children are deprived. 

B

[¶14] Mother argues the juvenile court erred in finding evidence that the conditions and causes of the children’s deprivation are likely to continue or will not be remedied.  Mother cites no law supporting this assertion and simply argues the evidence provided by petitioner did not prove clearly and convincingly that deprivation is likely to continue.  This Court may only overturn the juvenile court’s decision if it finds no evidence to support the finding or if, “on the entire record, we are left with a definite and firm conviction a mistake has been made.”  
In re D.M.
, 2007 ND 62, ¶ 6, 730 N.W.2d 604.  Based on this record, we conclude the juvenile court did not err.

[¶15] Mother’s conduct plus “[p]rognostic evidence, including reports and opinions of the professionals involved” may be used to form the determination deprivation will continue.  
T.A.
, 2006 ND 210, ¶ 15, 722 N.W.2d 548.  A parent’s lack of cooperation with social services can be evidence that deprivation is likely to continue.  
In re T.F.
, 2004 ND 126, ¶ 19, 681 N.W.2d 786.  The juvenile court acknowledged that from the time Mother began working with social services in August 2003 until the final removal in June 2006, numerous services were provided to the family, including parenting education, welfare checks, parent aide services, homemaker services, day care services, case management services, a chemical dependency evaluation, a parental capacity evaluation, counseling services, infant development counseling, speech and occupational therapy for Sam, financial and medical assistance and supervised visitation.  Despite all this assistance, Mother missed appointments, refused treatment for her physical and mental ailments and ultimately did not improve her parenting. 

[¶16] Particularly relevant is the testimony of an in-home care support specialist assigned to Mother.  The support specialist provided weekly housekeeping help and attempted to establish a cleaning routine.  Mother did not follow through.  The support specialist testified she and Mother would clean, but the next week she would find the home in disorder.  The support specialist  suggested Mother keep the home picked up and rinse the dirty dishes, but Mother did not comply.  While a lack of cleanliness of the home alone does not provide a sufficient showing of deprivation necessary to terminate parental rights, parents must at least provide care “that satisfies the minimum community standards.”  
In re M.S.
, 2001 ND 68, ¶ 12, 624 N.W.2d 678.  Sam and George have been removed from Mother’s home twice before this incident due to deprivation.  Upon the children’s return home, the unhealthy and unsafe living situation did not improve.  Placement in foster care followed by reunification has become a cycle for this family.  The juvenile court’s determination that deprivation would continue is not clearly erroneous.

C

[¶17] Termination of parental rights requires clear and convincing evidence that “the child is suffering or will probably suffer serious physical, mental, moral, or emotional harm.”  N.D.C.C. § 27-20-44(1)(c)(1).  The risk of future harm may be based on evidence of previous harm.  
See
 
In re M.B.
, 2006 ND 19, ¶ 18, 709 N.W.2d 11.  Here, the referee found the children will be harmed if Mother’s parental rights are not terminated.  “To terminate parental rights, a court need not await the happening of a tragic event.”  
In re T.K.
, 2001 ND 127, ¶ 17, 630 N.W.2d 38.  Sufficient evidence exists showing the children have been harmed by Mother’s lack of care.  For example, Mother told her social worker the children were anaemic, and when asked what she had been feeding them, she referenced only cereal and macaroni.  As a result, George is substantially underweight.  Mother’s home was littered with choking hazards, such as the pennies George put into his mouth during the social worker’s visit.  A registered nurse who provides in-home visits to assess safety issues stated: 

“The thing that I was thinking about, you know, were the soiling and the dirty environment and crawling, children always put their hands in their mouth and to be crawling — crawling up things and the bacteria, infection, those kinds of things as well as the cluttering and tripping, falling.”  

[¶18] Furthermore, Sam has exhibited delayed language and motor skills.  A speech language pathologist worked with Sam when he was living with Mother and later when he was placed in foster care.  The pathologist testified Sam’s progress was slight while living with Mother.  Since foster care placement, Sam has improved enough to have “closed the gap” in his developmental delay.  The pathologist attributes this improvement to Sam’s “consistent attendance and consistency in his life.”  Given the extensive assistance Mother received and the small impact it made on the family’s living situation, the juvenile court did not err in its assessment that Mother will likely be unable to provide a safe, healthy environment for the children in the future.  Sufficient evidence exits supporting the juvenile court’s finding that the children are likely to be harmed if Mother’s parental rights are not terminated.  The juvenile court’s factual findings are not erroneous.

D

[¶19] Finally, Mother argues reasonable efforts were not made to preserve and unify her family as required prior to termination of parental rights.  
See
 N.D.C.C. § 27-20-

32.2(2).  Reasonable efforts are defined as the “exercise of due diligence, by the agency . . . to use 
appropriate and available services
 to meet the needs of the child and the child’s family.”  N.D.C.C. § 27-20-32.2(1) (emphasis added).  Mother was given numerous resources to help her provide a better environment for her family.  A social worker reviewed Mother’s case plan prior to the children’s placement in foster care in June 2006.  This social worker testified there were no more services available that could be offered to Mother.  Moreover, the district court noted Mother’s participation in these services was “sporadic” and she cancelled or missed numerous appointments.  The agency does not have to exhaust every potential solution before termination of parental rights.  The juvenile court did not err in finding reasonable efforts had been made to preserve and unify this family prior to termination of Mother’s rights.

III

[¶20] The juvenile court’s factual findings with regard to deprivation, likelihood of future harm and reasonable efforts to preserve and unify the family are not clearly erroneous.  The juvenile court’s order terminating Mother’s parental rights to Sam and George is affirmed.

[¶21] Daniel J. Crothers

Mary Muehlen Maring

Carol Ronning Kapsner

Dale V. Sandstrom

Gerald W. VandeWalle, C.J.

FOOTNOTES
1:    
The parties’ names are pseudonyms.